1 of 1 DOCUMENT

Copyright 2005 Factiva, a Dow Jones and Reuters Company
All Rights Reserved

(Copyright (c) 2005, Dow Jones & Company, Inc.)
The Wall Street Journal

January 26, 2005 Wednesday
Correction Appended

**SECTION:** Pg. A1

**LENGTH:** 3474 words

**HEADLINE:** Detention Plan: In **Guantanamo,** Prisoners Languish In Sea of Red Tape --- Inmates Waiting to Be Freed Are Caught in Uncertainty;
Improvising Along the Way --- A Split Over Interrogations

**BYLINE:** By Christopher Cooper

**BODY:**

GUANTANAMO BAY, Cuba -- Brig. Gen. Michael Lehnert surveyed the sagging remains of an abandoned detention center here on Jan. 6, 2002. Nearly two months into the Afghanistan war, Secretary of Defense Donald Rumsfeld had given him just 96 hours to build a prison for 100 captured fighters. "Humane but not comfortable," Gen. Lehnert recalls his orders saying. "And nothing permanent."

The result, finished with nine hours to spare, resembled a high-security kennel: narrow chain-link cells on concrete slabs, topped with spirals of razor wire. The next day, the first batch of prisoners arrived from Afghanistan, wearing blacked-out safety goggles, shackles and mittens for extra restraint. In the next few weeks, Gen. Lehnert's orders kept changing: boost the number of cells to 300, then to 2,000. Then the Pentagon said to prepare the place for interrogations.

The history of the detention center at Guantanamo Bay is a particularly graphic illustration of how the U.S. stumbled into the war on terrorism unprepared for a new kind of enemy and had to improvise along the way. With combat in Afghanistan well under way, the U.S. had no place to detain captured Taliban and al Qaeda fighters and no procedures for handling them.

Since then, the detention camp, which now employs more than 2,200 soldiers and civilians, has struggled with the consequences of its rushed birth. American commanders acknowledge that many prisoners shouldn't have been locked up here in the first place because they weren't dangerous and didn't know anything of value. "Sometimes, we just didn't get the right folks," says Brig. Gen. Jay Hood, Guantanamo's current commander.

Emptying cells has posed yet another challenge. Commanders now estimate that up to 40% of the 549 current detainees probably pose no threat and possess no significant information. Military officials at Guantanamo say they have specifically recommended the release of about 100 of those men. But after a year of delay, the Pentagon, which makes the final call, has yet to act.

In a typical war covered by the Geneva Conventions, battlefield prisoners are freed en masse when peace is declared. The fight against Islamic terrorists, in contrast, promises to last indefinitely, and Defense Department officials admit that they are hesitant to release detainees while the conflict continues. "There wasn't a blueprint for this; the war is ongoing," says Gen. Hood. Overall, about 750 men have been brought to Guantanamo since January 2002, and roughly 200 have been released, including four Britons and one Australian freed this week. No prisoners have died at the camp, the U.S. says.

Questions about how to handle the minority of detainees thought to possess valuable information have also complicated the military's mission at Guantanamo. That uncertainty sparked a behind-the-scenes debate over harsh interrogation tactics that even some within government criticized as ineffective.

America's oldest overseas base, Guantanamo sits on the southwest coast of Cuba. The U.S. took possession of the area as a ship-refueling depot under a lease signed with the Cuban government in 1904, long before the rise of Fidel Castro. Breaking the lease requires the agreement of both governments, and the U.S. has just stayed put. Covering two sides of a wide bay, Guantanamo has been used as a firing range and a naval training center. For a time in the early and mid-1990s, it held thousands of refugees the U.S. intercepted as they fled Haiti and Cuba.

As the Pentagon prepared to invade Afghanistan, military officials say, Defense Secretary Rumsfeld first considered locations in southeast and central Asia, before deciding that Guantanamo was "the best of the worst." Some Bush administration officials say Guantanamo's murky legal status is an added plus.

Even though the U.S. controls the base, the Bush administration considers it to be beyond the reach of American laws. The administration has said that as "enemy combatants," rather than "prisoners of war," the detainees aren't covered by the Geneva Conventions but has pledged to treat them "in a manner consistent" with the conventions' principles. Critics, including lawyers representing Guantanamo detainees in suits against the government, allege that American officials have taken advantage of the legal haziness to mistreat prisoners and deny them their rights.

The first facility that Gen. Lehnert rebuilt and expanded is known as Camp X-Ray. As more enemy combatants arrived in early 2002, he started work a few miles away on Camp Delta, which held more than 700 prisoners at its peak later that year. Delta has more substantial open-air cells with bunks and sinks.

U.S. commanders now concede that rapid and sometimes-imprecise screening of the roughly 10,000 foes captured in Afghanistan meant that a portion of the men brought to Guantanamo didn't know much of importance about al Qaeda or the Taliban. Complicating the process, some prisoners had no identification, gave several aliases and spoke languages many American soldiers didn't understand. Most of those captured were taken to Bagram Air Base near Kabul, and a large majority have since been released.

About 80 to 85 men brought to Guantanamo turned out to have serious mental problems, American officers say, and several other prisoners were deathly ill. One psychotic Afghan prisoner, nicknamed "Wild Bill" by his captors, spoke four languages but spent most of his time shouting nonsense in English. Another man soldiers dubbed "Half-Dead Bob" arrived weighing 78 pounds and suffering from pneumonia, tuberculosis, frostbite and dysentery. Neither man offered much in the way of intelligence; they were treated and then returned to Afghanistan, American officials say.

After Gen. Lehnert's tour at Guantanamo ended in March 2002, a new pair of commanders arrived and with them came a split over interrogation tactics. It was during this period that reports of prisoner abuse at the base started to circulate within the government.

Maj. Gen. Michael Dunlavey, an Army reservist and a county judge in Pennsylvania, took over as the new commander of Guantanamo's interrogators. Brig. Gen. Rick Baccus, a national guardsman from Rhode Island, oversaw the guards. Gen. Baccus says that he generally advocated taking a more humanitarian approach, while Gen. Dunlavey pushed for tougher tactics. "We may not have always agreed on my philosophy regarding prisoner treatment," Gen. Baccus says. He adds, however, that he doesn't know of any detainees being mistreated during the period of the joint command -- from March through October of 2002.

Gen. Dunlavey declined to comment, citing a lawsuit filed against the U.S. military by three former detainees, in which he is one of the named defendants. The case is pending before a federal court in Washington.

A senior officer at the U.S. Southern Command, which oversees military operations in Latin American, including Guantanamo, says officials now believe that recent revelations about the possible mistreatment of prisoners may describe events during the period of split command in mid-2002. Some of the allegations are contained in e-mail sent by Federal Bureau of Investigation agents who participated in interrogations at Guantanamo. The e-mail, addressed to FBI colleagues and supervisors, became public as a result of a suit filed by the American Civil Liberties Union.

FBI agents described a variety of questionable interrogation techniques, including shackling prisoners for hours on the floor in the fetal position, subjecting them to extremes of heat and cold and introducing dogs into interrogations. In one case, a detainee was wrapped in an Israeli flag in an attempt to humiliate him, according to FBI e-mail.

Detention Plan: In Guantanamo, Prisoners Languish In Sea of Red Tape ---

The Southern Command has appointed a brigadier general to investigate the FBI complaints. Separate abuse allegations made by soldiers at Guantanamo have spawned another dozen or so internal investigations.

Officials at the Southern Command say that much of what happened in mid-2002 occurred without clear procedures in place or attentive oversight. "The truth is, there's a black hole in the timeline," says one Southern Command officer.

The White House had put into play the question of whether to use tougher-than-standard methods of interrogation. In response to a request from White House Counsel Alberto Gonzales, the Justice Department produced an official legal opinion in August 2002 that narrowed the definition of torture during interrogation, clearing the way for tougher methods. In his recent Senate hearings on his nomination to be attorney general, Mr. Gonzales said he opposes torture in all forms.

In October 2002, during the final days of his Guantanamo command, Gen. Dunlavey wrote a memo to his superiors at Southern Command, asking permission to step up the pressure on certain prisoners during interrogation. Current methods, the memo said, "have become less effective over time."

In early December, Defense Secretary Rumsfeld authorized the use of more aggressive tactics for a pair of detainees thought to have specific information about al Qaeda plans, U.S. officials say. One of those prisoners, Saudi national Mohamed al Qahtani, had tried unsuccessfully to enter the U.S. in August 2001 and was thought by American officials to have been a potential member of the 9/11 hijacking squad. Interrogators believed that Mr. Qahtani, who was captured on the Afghanistan-Pakistan border, knew about possible future terrorism plans, but he had resisted talking under conventional questioning methods.

With Mr. Rumsfeld's permission, interrogators isolated Mr. Qahtani and questioned him for grueling 20-hour sessions that included the use of a spotlight and loud music to disorient him. After 42 days, he cracked and provided information about some of al Qaeda's inner workings, U.S. officials say. He is now awaiting a military trial. The other detainee covered by the Rumsfeld authorization provided useful information under standard questioning, U.S. officials say.

(MORE)

Despite the successful Qahtani interrogation, there was unease in some quarters at Guantanamo about the overall effectiveness of such tactics.

A team of about 10 federal law-enforcement officials, led by Michael Gelles, a Navy Criminal Investigative Service behavioral psychologist, was visiting the facility to offer advice. Most of Guantanamo's interrogators were actually Arabic or Farsi linguists with little training in questioning. In late 2002, Mr. Gelles became concerned about the use of what he believed were improper and ineffective tactics, according to people who were involved.

Mr. Gelles, a civilian naval employee, tried to persuade Maj. Gen. Geoffrey Miller, who took over sole command of Guantanamo in November 2002 and held that post until early 2004, that interrogation based on building "rapport" made more sense. This approach calls for rewarding cooperation with extra privileges: better food, phone calls home and the like. The Gelles team argued that Muslim extremists, who consider the U.S. to be evil, can be psychologically shaken if they receive good treatment.

At least in the case of someone like Mr. Qahtani, Gen. Miller disagreed. "It was the same plan they'd been using for six months with no success," he says.

Gen. Miller went on to command the notorious prison at Abu Ghraib in Iraq, where extensive inmate abuse occurred. Though he was not commander there when the abuse took place, and he denies having any knowledge of it, some soldiers say he introduced aggressive interrogation procedures at Abu Ghraib during a visit there in late summer of 2003.

Frustrated at Guantanamo, Mr. Gelles took his concerns up the chain of command, ultimately to the Navy's general counsel, Alberto Mora, who relayed them to Mr. Rumsfeld. In January 2003, just six weeks after approving harsher techniques for Mr. Qahtani, the defense secretary rescinded them, convening a group of Pentagon lawyers to discuss the issue further. In March, that group recommended dialing back the techniques. Mr. Rumsfeld acceded, and the less aggressive rules, which hew more closely to standard military doctrine, remain in place today at Guantanamo, officials say.

Detention Plan: In Guantanamo, Prisoners Languish In Sea of Red Tape ---

Guantanamo records made available to The Wall Street Journal suggest that in many cases, plans for interrogation sessions have become less confrontational. A plan drafted in February 2003 for a juvenile prisoner called for six hours of direct questioning emphasizing the theme that his mother would want him to be cooperative. Coffee and tea were to be used as incentives. "It's important to get the [detainee's] name right," the interrogation plan says. "Try to get him to write down his name in his native script."

The camp's current commander, Gen. Hood, a former artillery officer who took over from Gen. Miller in March 2004, says he, too, favors the softer approach to interrogation and has even expanded the reward system. But he is hamstrung in his efforts because the ultimate reward -- a convincing promise of release -- is hard to provide.

To illustrate, Gen. Hood calls up from a computer database the dossier of what he says is a typical detainee: a 25-year-old man with a bright smile, tangled hair and four aliases. The database, known as the Detainee Interrogation Management System, includes biographical facts, polygraph results and interrogation summaries. This prisoner, a former yarn-factory worker who speaks four languages, arrived at Guantanamo with tuberculosis but has since recovered. He has had run-ins with guards, threatening at one point to kill one of them. He has been observed over the years engaged in physical training and sometimes leads Islamic prayers from his cell.

But the digital dossier concludes that the detainee has been truthful -- and fully drained of any useful information. Gen. Hood says that he recommended within the past six months -- he won't say exactly when -- that the man be released. But that hasn't happened yet.

In theory, once a detainee is thought no longer to present a threat to the U.S. or possess any valuable intelligence, he should be sent home. Current policy calls for him to receive a pair of jeans, a white or light-blue polo shirt and, if headed for cooler climes, a windbreaker.

In practice, the system is stuck. Releasing a prisoner requires the approval of Defense Department headquarters, as well as the State Department, Central Intelligence Agency and the FBI. "Nobody wants to be the one who signs the release papers," says Gen. Hood. "There's no muscle in the system." With less than a third of current detainees being actively interrogated, Guantanamo officials say the prison population should be much smaller.

The Pentagon concedes that it has been somewhat flummoxed by the challenge of freeing former fighters while the fight against terrorism persists. "We've wanted to be thorough and deliberate, and there are a number of pressures and risks" when detainees are identified for release, says Matthew Waxman, deputy assistant secretary of defense for detainee affairs. "Without a lot of experience under our belt, it was hard to figure out where to draw the line." Indeed, there have been cases of recidivism: Of the 200 men released so far from Guantanamo, the Pentagon says about a dozen are thought to have rejoined forces fighting the U.S.

Some otherwise releasable detainees present special problems. Two dozen Uighurs, Muslim ethnic Chinese from central Asia who were picked up in Afghanistan, would face almost certain execution if returned to Beijing.

The inability to promise freedom as a realistic incentive has itself become a potential hindrance. The recent interrogation of a Yemeni prisoner illustrates the problem. The detainee, a thin man with a huge beard and shaved head, arrived in the camp in October after being held for two years in Afghanistan. He sat impassively in a cramped concrete interview booth, as an interrogator and a linguist asked warm-up questions about the health of his family.

"They are writing that they're healthy, but they're careful what they write," the detainee said in Arabic. "They don't want to depress me."

In a dispassionate tone, the interrogator accused the Yemeni of having been a Taliban commander and demanded that he confirm this. "Evidently, you did bad things," the interrogator said.

The Yemeni grimaced, twisting a strand of his beard through long fingers. "My enemies brought me to you," he said.

When the interrogator suggested that cooperation could win his release, the Yemeni grew morose. "They asked me in Khandahar [Afghanistan]; they asked me at Bagram. I say I don't know," he replied. "I dreamed that I will die in here. No matter how much you ask me questions, I know my case will never be finished."

Steve Rodriguez, a former military-intelligence officer who, as a private contractor, heads the intelligence unit at Guantanamo, says gathering new information has become more challenging as detainees retain lawyers and the White House releases details on what questioning methods are allowed. Visiting lawyers, for instance, provide their clients

with information that undermines the sense of isolation that interrogators count on to disorient detainees. News from the outside spreads quickly among prisoners. It was only a few hours after President Bush won re-election that the whole camp knew the result, Gen. Hood says. "I'm told that they had a pretty active discussion about red and blue states."

Gen. Hood says he is optimistic that a new panel, called the Adjudication Review Board, will send scores of prisoners home. Meeting in December to hear its first two cases, the board promises to operate like an independent parole body, reviewing every prisoner's case at least once a year. "There are significant numbers of men here, who once their cases are heard will probably be given over to their government or released," Gen. Hill says. "If that doesn't happen, I'm going to be doing some yelling."

But Michael Ratner, a lawyer with the Center for Constitutional Rights in New York, which represents several detainees and finds attorneys for others, is skeptical. "It's the hope of all of us that they just need an excuse or rationale to clear the place out," he says, "but I'm not sure why they would change now."

Even as Gen. Hood tries to empty some cells, Guantanamo is taking on a more permanent feel. About half of the population now lives dormitory-style in a sprawling camp, where prisoners can wash their own clothes and play soccer.

In December, Camp Delta published the first issue of a detainee newsletter. It had articles on the elections in Afghanistan and the Afghan Olympic team, a list of professional soccer standings and a weather map of the Middle East (except for Israel). The military recently put the finishing touches on Camp Iguana: a new barbed wire-enclosed structure that offers detainees televisions and a rare glimpse of the sea.

This spring, the military expects to break ground for the construction of a more conventional $35 million prison for 220 inmates. Gen. Hood says, "We've all come around to the realization that some of these guys are going to be with us for a long, long time."

(MORE)

---

```
          Improvising as They Go

   Impromptu policies at the Guantanamo Bay detention camp help explain the
debate over interrogation methods and the difficulty in releasing inmates.

   -- Jan. 6, 2002: Construction of the Guantanamo detention camp begins;
first prisoners arrive from Afghanistan five days later.

   -- Jan. 25, 2002: White House Counsel Alberto Gonzales recommends that the
Geneva Conventions on prisoners of war not be applied to detainees.

   -- Oct. 11, 2002: Maj. Gen. Michael Dunlavey, head of interrogations at
Guantanamo, asks his superiors for permission to use tougher techniques.

   -- Nov. 4, 2002: Maj. Gen. Geoffrey Miller takes command of Guantanamo.

   -- Dec. 2, 2002: Defense Secretary Donald Rumsfeld approves more aggressive
interrogation techniques, which are employed on Mohamed al Qahtani, who is
suspected of having information about impending attacks.

   -- Jan. 15, 2003: Mr. Rumsfeld repeals harsher techniques.

   -- March 21, 2003: Eighteen prisoners are returned to their home countries
in the largest release to date. Though the number freed swells to 200,
Guantanamo officials say many more are probably suitable for release.

   -- March 24, 2004: Brig. Gen. Jay Hood assumes command at Guantanamo.

   -- Dec. 20, 2004: A raft of internal FBI e-mail surfaces that suggests
Guantanamo inmates were tortured during interrogations.
```

```
Source: Joint Task Force Guantanamo; WSJ research
```

(See related letters: "Letters to the Editor: Enemy Prisoners Facing The Worst -- Bureaucrats" -- WSJ Feb. 4, 2005)

**NOTES:**
PUBLISHER: Dow Jones & Company Inc.

**CORRECTION:**

Corrections & Amplifications

A QUOTE in a page-one article yesterday on the U.S. detention center at Guantanamo Bay was misattributed. Brig. Gen. Jay Hood, the current commander of the detention camp, said, "There are significant numbers of men here, who once their cases are heard will probably be given over to their government or released. If that doesn't happen, I'm going to be doing some yelling." The article incorrectly attributed the quote to a Gen. Hill. It also incorrectly referred to the Administrative Review Board as the Adjudication Review Board and the Naval Criminal Investigative Service as the Navy Criminal Investigative Service.

(WSJ Jan. 27, 2005)

GUANTANAMO BAY is located on the southeast coast of Cuba. A page-one article Wednesday about the military prison there incorrectly said the inlet is located on the southwest coast. In addition, Uighurs are Turkic in ethnicity. The same article incorrectly said they are ethnic Chinese.

(WSJ Jan. 28, 2005)

STEVE RODRIGUEZ, who heads the intelligence unit at Guantanamo Bay, is a civilian member of the Pentagon's Defense Intelligence Agency. A page-one article Jan. 26 about the U.S. detention center there incorrectly said he was a private contractor. In addition, the article said that some prisoners, including an Australian, had been released that week. The Australian's release to his home country was completed two days after the article was published.

(WSJ Feb. 14, 2005)

(END)

**LOAD-DATE:** February 21, 2005