

## Egypt

## Country Reports on Human Rights Practices - 2004
Released by the Bureau of Democracy, Human Rights, and Labor
February 28, 2005

The Arab Republic of Egypt has been governed by the National Democratic Party (NDP) since the party's establishment in 1978. The NDP continues to dominate national politics and has maintained an overriding majority in the popularly elected People's Assembly and the partially elected Shura (Consultative) Council. Islam is the state religion. In 1999, President Hosni Mubarak was reelected unopposed to a fourth 6-year term in a national referendum. The President appoints the Cabinet and the country's 26 governors and may dismiss them at his discretion. The 1971 Constitution provides for an independent judiciary; however, it is subject to influence by the Executive, and application of the 1981 Emergency Law undermined its independence. The Government continued to use the Emergency Law to try non-security cases in the emergency and military courts. Corruption was a problem.

The Ministry of Interior controls the State Security Investigations Service (SSIS), which conducts investigations and interrogates detainees, and the Central Security Force (CSF), which enforces curfews and bans on public demonstrations. Security forces continued to arrest and detain suspected terrorists. The President is commander-in-chief of the military. The Government maintained effective control of the security forces, which committed numerous, serious human rights abuses.

The country is transforming from a government-controlled economy to a free market system; however, state-owned enterprises still dominated some key sectors of the economy. The country had a population of approximately 70.5 million. Approximately 30 percent of the population worked in the agriculture sector, which is almost entirely privately owned. An estimated 3 to 5 percent of the population were subsistence farmers. Income from tourism, remittances from approximately 2 million citizens working abroad, petroleum exports, and Suez Canal revenues were the other principal sources of foreign currency and were vulnerable to external shocks. Approximately 17 percent of the population live in poverty, but the poor performance of the economy over the past 4 years likely has increased that figure.

The Government respected human rights in some areas; however, its record was poor, and in many areas serious problems remained. Citizens did not have the meaningful ability to change their government. The use of military courts to try civilians and Emergency Courts to try political cases continued to infringe on a defendant's constitutional right to a fair trial before an independent judiciary. The 1981 Emergency Law, extended in February 2003 for an additional 3 years, continued to restrict many basic rights. The security forces continued to mistreat and torture prisoners, arbitrarily arrest and detain persons, hold detainees in prolonged pretrial detention, and occasionally engage in mass arrests. Local police killed, tortured, and otherwise abused both criminal suspects and other persons. Police continued to arrest and detain homosexuals. The Government partially restricted freedom of the press and significantly restricted freedom of assembly and association. The Government placed some restrictions on freedom of religion. Domestic violence against women remained a problem. Female genital mutilation (FGM) persisted, despite government and nongovernmental efforts to eradicate the practice. Tradition and some aspects of the law discriminated against women and religious minorities, including Christians and particularly Baha'is. The Government limited workers' rights. Child labor remained widespread, despite government efforts to eradicate it. Exposure of workers to hazardous working conditions and other employer abuses continued.

During the year, the Government convicted 14 police officers for abuse and torture of prisoners. The Government abolished State Security Courts in 2003 but continued to use Emergency Courts. The Government established the National Council for Human Rights. The Government generally permitted human rights groups to operate without restrictions; although several groups encountered difficulty registering under the NGO law, they developed alternate means to conduct their work.

## RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary and Unlawful Deprivation of Life

There were no reports of political killings; however, during the year, human rights organizations and the press reported that at least 10 persons died in custody at police stations or prisons.

In June, the Egyptian Organization for Human Rights (EOHR) issued a report entitled "Torture: An Unchecked Phenomena," in which it documented 41 cases of torture in police stations resulting in 15 deaths in custody from April 2003 to April 2004. EOHR also asserted that from April 1993 to April 2004, it documented 412 cases of torture in police stations, including 120 cases where detainees died as a direct result of torture.

On February 25, police arrested Sayyed Mustafa for defaulting on a loan. They tortured him at Awseem police station in Giza Governorate. On March 20, police transferred him to Qasr El Eini hospital, which declined to admit him, apparently for fear that the hospital would be held liable for his condition. The police returned him to Awseem, where he died the same day. The Public Prosecutor ordered an investigation, the results of which remained unavailable at year's end.

Following the arrest of 52 Muslim Brotherhood (MB) members in May, one of the detainees, Akram Abdel Aziz El Zuhairy, died in custody. The MB leadership said that he died from torture. MB members of Parliament called for an immediate investigation, which led to the formation of a committee that visited Tora prison in June where the other 51 MB members were being held. The Ministry of Interior denied the torture allegations, and instead claimed that Zuhairy hit his head while being transported between detention and a meeting with prosecutors. On June 15, the Office of Forensic Medicine issued a report asserting that there were no signs of injury to Zuhairy's body.

On August 27, 2 detainees died and 18 others required hospitalization for asphyxiation/heat exhaustion after police transported them in poorly ventilated trucks to Cairo from Saloum, on the Libyan border. These dead and injured were part of a group of 80 young men who had illegally crossed the Libyan border for the eventual purpose of seeking work in Italy. Libyan authorities arrested the men and deported them in air-conditioned buses. Egyptian authorities, however, used two enclosed non-air-conditioned police trucks for the 12-hour trip to Cairo. Upon arrival at Khalifa Police Station, 2 detainees had died and 18 others needed hospitalization. A number of the detainees further said that police officers beat them during the trip after they pleaded for better ventilation. The Minister of Interior and the Office of the Public Prosecutor ordered immediate investigations, but at year's end had not publicized their findings.

The investigation into the deaths of five prisoners in 2002 at Ghurbaniyat Prison in Alexandria reportedly was completed, although the Government has declined to publicize its findings.

b. Disappearance

Human rights monitors continued to call attention to unresolved cases of disappearance during the year. The February 2003 disappearance of Adel Mohammed Kamiha, a coffee shop owner who reportedly disappeared following his transfer from police custody to State Security in Alexandria, remained unsolved.

In August 2003, Reda Helal, a journalist, disappeared. The police initiated an investigation into his disappearance; however, Helal's whereabouts continued to be unknown at year's end. Despite continued speculation by human rights groups that the Government might be withholding information about his disappearance, there was no evidence to support this assertion.

On March 31, the Human Rights Association for the Assistance of Prisoners (HRAAP) filed suit against the Ministry of Interior and the Yemeni Embassy in Cairo to determine the whereabouts of Brigadier Ahmed Salem Ebeid, a Yemeni citizen and former Yemeni Deputy Minister of Defense and former Minister of Information. Ebeid, who had resided in Egypt since 1994, disappeared on February 18. HRAAP asserted that the Government exchanged Ebeid, alleged by Yemeni authorities to be an opposition member, for an Egyptian terror suspect in Yemeni custody. In a December 8 hearing, HRAAP lawyers showed that Ebeid was no longer in Egypt. The next hearing is scheduled for February 2005.

On April 18, HRAAP appealed to President Mubarak to investigate the disappearances of 29 individuals who had been arrested by State Security officers, dating back to 1989. Most prominent among these cases is a

former Libyan Deputy Foreign Minister who disappeared in 1992.

During the year, EOHR reported that it was following 59 cases of disappearance within the country since 1992. Domestic human rights organizations provided names to the U.N. Working Group on Enforced and Involuntary Disappearances; the Government reportedly has denied involvement in any of the cases.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The Constitution prohibits the infliction of "physical or moral harm" upon persons who have been arrested or detained; however, torture and abuse of detainees by police, security personnel, and prison guards remained common and persistent. According to the U.N. Committee Against Torture, a systematic pattern of torture by the security forces exists, and police torture resulted in deaths during the year (see Section 1.a.).

Under the Penal Code, torture or giving orders to torture are felonies punishable by 3 to 10 years imprisonment. For death resulting from torture, the crime is considered intentional murder punishable by a life sentence. Arrest without due cause, threatening death, or using physical torture are crimes punishable by imprisonment. Abuse of power to inflict cruelty against persons is a crime punishable by imprisonment and fines. In June 2003, the Government abolished hard labor as a punishment.

Victims may also bring a criminal or civil action for compensation against the responsible government agency. There is no statute of limitations in such cases.

Despite these legal safeguards, there were numerous, credible reports that security forces tortured and mistreated detainees. Human rights groups reported that the State Security Investigations Service (SSIS), police, and other government entities continued to employ torture to extract information, coerce opposition figures to cease their political activities, and to deter others from similar activities. Reports of torture and mistreatment at police stations remained frequent. In prominent cases, defendants alleged that police tortured them during questioning (see Sections 1.e. and 2.c.). Although the Government investigated torture complaints in some criminal cases and punished some offending officers, punishments generally have not conformed to the seriousness of the offense.

Principal methods of torture reportedly employed by the police and the SSIS included stripping and blindfolding victims; suspending victims from a ceiling or doorframe with feet just touching the floor; beating victims with fists, whips, metal rods, or other objects; using electrical shocks; and dousing victims with cold water. Victims frequently reported being subjected to threats and forced to sign blank papers for use against themselves or their families should they in the future complain about the torture. Some victims, including male and female detainees and children, reported sexual assaults or threats of rape against themselves or family members. While the law requires security authorities to keep written records of detentions, human rights groups reported that the lack of such records often effectively blocked investigation of complaints.

The Emergency Law authorizes incommunicado detention for prolonged periods. Detentions under this law frequently were accompanied by allegations of torture (see Section 1.d.).

In May, the Government's Central Audit Agency directed the Ministry of Interior (MOI) to require any security/police officers found to be responsible for torture to be financially liable for any judgments levied against the MOI. The Audit Agency noted during the prior year that punitive damages awarded by the courts to victims of torture amounted to approximately LE 2.8 million ($450,000) in the 8 governorates (of 26 in the country) where data was available.

In October 2003, according to media accounts and human rights monitors, police in Helwan stormed a house searching for two suspects in a homicide. Although the suspects were not present, police took into custody between 11 and 15 members of their family, including 4 women. The detained family members allege they were beaten, whipped, suspended, stripped, and molested as police attempted to extract information about the whereabouts of the two suspects. On October 24, a criminal court scheduled the next hearing on the case for February 2005.

The Government continued efforts during the year to hold security personnel accountable for torturing prisoners in their custody; however, the Government continued its practice of giving light sentences to security personnel convicted of serious abuses, including torture resulting in death. Human rights organizations and the press reported that 14 police officers in 5 separate cases, 2 of which involved deaths in custody, were held publicly accountable. Eight police officers in 1 case involving 1 death were acquitted; and 6 cases, including 2 that led to deaths in custody involving charges against 15 police officers, remained before the courts at year's end. Some of the cases involved incidents that took place in previous years.

In a 2002 report "The Truth," HRAAP (previously HRCAP, the Human Rights Center for the Assistance of Prisoners), commended judicial efforts to prosecute security officers for torture, but it also outlined current obstacles, including a vague legal definition of torture and the inability of victims to sue perpetrators directly.

In May 2003, a court of appeal upheld the December 2002 conviction of police officer Arafa Hamza, who had been sentenced to 1 year in prison for the death from torture of 21-year-old student Ahmed Mahmoud.

There were no developments in the prosecution of Luxor Police Major Magdy Awad and an assistant for the May 2003 torture of Nagdy Mohamed Gad El Rub.

Numerous cases of torture were documented. For example, on October 11, the North Cairo Criminal Court sentenced policeman Ashraf El Ganzouri from the Azbakiya Police Station to 5 years in prison after he was convicted of illegally detaining and torturing to death Mohamed Hassan Abdallah in 2003. Ganzouri was charged with beating Abdallah during an identity card investigation. Abdallah resisted and Ganzouri's final attack resulted in Abdallah's death due to blunt trauma to the head.

On January 22, the Public Prosecutor indicted Major Yasser Ibrahim El Akkad, the head of the Criminal Investigations Department at Haram Police Station, on charges that he tortured actress Habiba while investigating the 1999 killing of Habiba's husband. Habiba was convicted and sentenced to 10 years in prison. After serving 5 years of her sentence, new evidence emerged, implicating five other persons in the murder. The Public Prosecutor also indicted these five new suspects. On February 17, the Court of Cassation accepted Habiba's appeal and ordered a retrial. The prosecution of Major El Akkad is scheduled to begin in February 2005.

On April 23, the Public Prosecutor directed a Qalyoubiya criminal court to charge a police captain from Kafr Shukr with excessive use of force. The captain had sought to arrest the son of Mabrouka Ibrahim Moselhi for theft. When Moselhi told the captain that her son was not at home, the captain assaulted her. After the assault, she required hospital treatment, and filed a complaint with the Public Prosecutor. By year's end, the Public Prosecutor had announced no additional developments in the case.

On April 5, the Court of Cassation rejected the appeal of Captain Ashraf Gohar of the Nasr City II police station. Gohar's conviction of charges stemming from the illegal detention, torture, and killing of Sayyed Eissa originally resulted in a 3-year sentence in 2002. A 2003 appeal to a lower court had reduced Gohar's sentence to 1 year, but the Court of Cassation affirmed the original penalty.

In May and again in December, the Alexandria Criminal Court postponed the case of Ahmed Khalil Ibrahim. Two officers and four policemen, including Yasser Youssri, had been charged with torture leading to the death of Ibrahim in 2002, as well as falsification of official documents to cover up the crime. The Association for Human Rights Legal Aid (AHRLA) also filed a civil case on behalf of Ibrahim's family seeking LE 10 million ($1.6 million) in compensation. The Court is scheduled to consider the case in March 2005.

On June 6, the Banha Criminal Court (in Qalyoubiya Governorate) began the trial of four police officers accused of forcing three members of a family to make a wrongful murder confession. The family members were convicted in 2003 and sentenced to 10 years' imprisonment. Shortly after they began their sentences, a serial killer confessed to the crime. The trial of the police officials was underway at year's end.

During the year, civil courts continued to review cases and frequently awarded compensation to victims of police abuse. Human rights observers recommended that rules and standards for victims be established to obtain redress and parity in compensation.

Civil cases won compensation for some victims of torture. For example, on February 25, the South Cairo Court of Compensations awarded Mustafa Ibrahim Amin Ibrahim LE 5,000 ($806) in punitive damages as a result of torture during his detention from 1999 to 2001. On July 26, the South Cairo Court of Compensations awarded Ibrahim an additional LE 10,000 ($1,612) in punitive damages for torture during detention from 1993 to 1995. Ibrahim, who spent 12 years in detention, was released in October 2003. HRAAP raised the case on Ibrahim's behalf.

On March 31, the South Cairo Court of Compensations awarded Hamdy Mahmoud Abdel Latif Emara LE 14,000 ($2,258) in punitive damages from torture during his detention from 1996 to 1998. Hamdy, who spent 6 years in detention, was finally released in July 1998. HRAAP raised the case on behalf of Hamdy. On April 14, another branch of the same court granted Hamdy an additional LE 7,000 ($1,129) in punitive damages for torture during his detention from 1992 to 1993.

On May 12, the South Cairo Court of Compensations awarded LE 15,000 ($2,419) punitive damages to Tarek Abdel Sattar Ahmed Murad as a result of torture during detention from 1997 to 1999. On May 26, another branch of the compensation court granted him an additional LE 15,000 ($2,419) in punitive damages. Notwithstanding his award, Murad remained in detention without charge. HRAAP pled the case on Murad's behalf.

On September 13, the South Cairo Court of Compensations awarded Abdel Fattah Mohamed LE 24,000 ($3,871) in punitive damages for torture during his detention period from 1994 to 1996. Mohamed spent 12 years in detention without charge through renewed detention orders. HRAAP raised the case on Mohammad's behalf.

In 2002, police arrested Zaki Saad Zaki Abd al-Malak, a 23-year resident of Ismailia in an Internet sting operation. Human Rights Watch (HRW) reported that police beat him daily during 2 weeks of detention in Agouza Police Station. Malak was sentenced to 3 years' imprisonment, followed by 3 years' police supervision. According to reports, he was being held in Borg al-Arab prison near Alexandria. On October 17, the Court of Cassation overturned Zaki's conviction on appeal, and he was released.

In 2002, three domestic human rights associations, as well as two international organizations, presented their allegations and findings to the U.N. Committee Against Torture (the "Committee"), a subcommittee of the U.N. Commission on Human Rights. The Committee's report expressed concerns about the continued implementation of the state of emergency; consistent reports of torture and ill treatment; abuse of juveniles and homosexuals; the continued use of administrative detention; the lack of access by victims of torture to the courts and lengthy proceedings; and disparities in the awarding of compensation.

The report included several recommendations: ending the state of emergency; the adoption of a clear legal definition of torture; the abolition of incommunicado detention; the review of military court decisions by a higher tribunal; the removal of ambiguities in the law that allow the prosecution of individuals for their sexual orientation; the acceptance of a visit by a U.N. Special Rapporteur on Torture; the establishment of rules and standards for victims; and allowing human rights organizations to pursue their activities unhindered. The Government maintained that the Committee's recommendations were under review at year's end.

Actions cited by the Government include the abolition of flogging in prisons; unannounced inspections of places of detention; court decisions that disregarded confessions obtained under duress; increased human rights training for police officials; and the establishment of several human rights committees and departments within government ministries. With assistance from the U.N. Development Program, the Government began to implement the Committee's recommendation for increased human rights training for law enforcement personnel and prosecutors.

The Government did not permit a visit to the country by the U.N. Special Rapporteur on Torture during the year.

Prison conditions remained poor. EOHR and HRAAP both stressed the deteriorating conditions in prisons, especially overcrowded cells and a lack of medical care, proper hygiene, food, clean water, proper ventilation, and recreational activities. Tuberculosis was widespread; overcrowded cells remained a problem. Some prisons continued to be closed to the public.

In July, HRAAP stated in its 2003 annual report that prison conditions remained dismal. HRAAP emphasized the deteriorating conditions in temporary detention.

In October, Al-Ahram newspaper reported that the MOI was planning to deliver a statement to the People's Assembly (Committee for Defense and National Security) on the violation of rights of detainees at police stations. This initiative came in response to the interpellations by several Members of Parliament concerning the deaths of two detainees who were being transported from the Libyan border to Cairo (see Section 1.a.). At year's end, the Ministry had not provided its statement to the People's Assembly.

Failure to implement judicial rulings regarding the release of administrative detainees and the opening of prisons to visits remained a problem. Relatives and lawyers often were unable to obtain access to prisons for visits. Restrictions were placed on visits to prisoners incarcerated for political or terrorist crimes, limiting the number of visits allowed for each prisoner and the total number of visitors allowed in the prison at one time.

On August 22, Dar al-Ifta, the official body responsible for issuing Islamic fatwas (legal opinions) issued a legal opinion that all prisoners should be allowed spousal visits on a monthly basis.

As required by law, the public prosecutor continued to inspect all regular prisons during the year; however,

findings were not made public. The SSIS "detention centers" were excluded from mandatory judicial inspection.

There were separate prison facilities for men, women, and juveniles. In practice, the separation of adults from juveniles did not always occur, and abuse of minors was common. Civilians were not detained in military prisons. Political prisoners generally were detained separately from prisoners convicted of violent crimes.

Lawyers were permitted to visit prisoners in their capacity as legal counsel; however, in practice, they often faced considerable bureaucratic obstacles that prevented them from meeting with their clients (see Section 1.d.). The International Committee of the Red Cross (ICRC) and other domestic and international human rights monitors did not have access to prisons or to other places of detention.

On November 1, inmates at Abu Zabal prison began a hunger strike to protest conditions at the prison, which was ongoing at year's end. The prisoners' complaints included mistreatment, inadequate medical care, poor sanitation, and limits on visitors.

d. Arbitrary Arrest or Detention

The Constitution prohibits arbitrary arrest and detention; however, during the year, security forces conducted large-scale arrests and detained hundreds of individuals without charge. Police also at times arbitrarily arrested and detained persons.

Previously, to obtain a warrant from a judge or prosecutor, the Constitution provided that police had to show that an individual likely committed a specific crime. The Emergency Law nullified this requirement in 1981 and provides that in order to obtain a warrant, police must show only that an individual poses a danger to security and public order.

The country has both local and national law enforcement agencies, all of which fall under the Ministry of Interior. Local police operate in large cities and governorates. State Security and Central Security Force officers are responsible for law enforcement at the national level and for providing security for infrastructure and key officials, both domestic and foreign. Single-mission agencies, such as the Tourist and Antiquities Police and the Anti-Narcotics General Administration, also work at the national level.

There were continued instances of torture by police, and human rights monitors believed the use of torture by police was widespread. Although some police were prosecuted, human rights monitors believed most incidents of torture went unpunished. There was widespread petty corruption in the police force, especially below senior levels. There is an internal affairs mechanism, the workings of which are not publicized, which was regularly employed for investigating corruption and other instances of police malfeasance. Judicial recourse was also employed (see Section 1.c.).

The Emergency Law allows detention of an individual without charge for up to 30 days, after which a detainee may demand a court hearing to challenge the legality of the detention order, and may resubmit his motion for a hearing at 1-month intervals thereafter. There is no limit to the detention period if a judge continues to uphold the detention order or if the detainee fails to exercise his right to a hearing. Incommunicado detention is authorized for prolonged periods by internal prison regulations. Human rights groups and the U.N. Committee Against Torture both expressed concern over the application of measures of solitary confinement.

Access to counsel is provided in normal cases, but there were reports that some suspects detained under the normal Penal Code experienced difficulties meeting with counsel. In Emergency Law cases, however, access to counsel was often restricted or denied prior to the transfer of the accused to a courtroom for the start of proceedings. Many detainees under the Emergency Law remained incommunicado in State Security detention facilities without access to lawyers. After these cases are transferred to trial, the court appoints a lawyer from a duty roster issued by the Bar Association.

In addition to the Emergency Law, the Penal Code also gives the State broad detention powers. Under the Penal Code, prosecutors must bring charges within 48 hours following detention or release the suspect. However, they may detain a suspect for a maximum of 6 months pending investigation. Arrests under the Penal Code occurred openly and with warrants issued by a district prosecutor or judge. There is a functioning system of bail for persons detained under the Penal Code. The Penal Code contains several provisions to combat extremist violence, which broadly define terrorism to include the acts of "spreading panic" and "obstructing the work of authorities."

Hundreds, perhaps thousands, of persons have been detained administratively in recent years under the Emergency Law on suspicion of terrorist or political activity. Several thousand others have been convicted and

were serving sentences on similar charges (see Section 1.e.). In a July 2003 interview published in Al-Ahram Weekly, HRAAP (formerly HRCAP) estimated that the total number of persons held in administrative detention was approximately 15,000. HRAAP further estimated that about 7,000 additional persons have been released over the past 3 years. According to HRAAP, approximately 300 detainees, including convicts with remaining sentences and those who had been held under emergency administrative detention, were released during the year. In addition to these individuals, a much larger number of regular convicts were released during the year, as result of having completed their sentences.

In August 2003, 37 men suspected of belonging to the banned Gama' al-Islami (Islamic Group, IG), which took part in a violent campaign to overthrow the Government in the 1990s, were arrested. The men remained in detention at year's end.

On March 22, HRAAP appealed to the President for the release of 55 Egyptians and Palestinians arrested in 2000 for participating in pro-Palestinian/Intifada demonstrations. The 55 detainees remain in Gharbaniyat Prison in Alexandria. HRAAP claimed that many suffered serious health problems.

On May 9, the leftist Al Arabi newspaper reported that the MOI "secretly" released 100 detained members of Gama' al-Islami who had served their terms or whose administrative detention orders had expired.

On June 18, in an interview with Al-Wafd newspaper, General Mahmoud Wagdy, Assistant to the Minister of Interior and Director of the Prison Authority, stated that 500 detainees had been released in April. In the past, these types of releases often included a mix of two groups: prisoners detained for political or security reasons; and ordinary convicts who have completed their sentences. The Government has not normally provided details on categories of prisoners released.

On June 10, the Minister of Interior established a permanent "probation board" to review cases of inmates eligible for early releases. The board planned to tour one prison each month. On August 16, a first group of 164 inmates--including 8 political detainees--was released.

On July 5, HRAAP issued a statement claiming that police arrested 51 relatives of escaped convict Mohamed Saleh Abdel Mohsen in order to pressure him to surrender to police. The MOI admitted that the arrests occurred, but denied that any of the detainees were tortured. Mohsen was a drug kingpin who escaped from Mansoura prison along with seven other prisoners.

In mid-November, HRAAP and EOHR issued press releases calling on the Government to release detainees, estimated to number 3,000, whom government security forces arrested in the Sinai, mostly around the town of Al-Arish, after the October 7 terrorist bombings in Taba and Nuweiba that killed 34 people. On November 29, Amnesty International (AI) also condemned the detentions and called on the Government to release the detainees. Government officials acknowledged that they made an unspecified number of arrests in connection with the investigation, but insisted that the reports by human rights groups were exaggerated.

In mid-November, on the occasion of the Eid al-Fitr holiday at the end of Ramadan, the local and international media reported that the Government released approximately 700 Islamist detainees.

During the year, security forces arrested approximately 90 persons allegedly associated with the Muslim Brotherhood (MB), which has been an illegal organization since 1954. Charges leveled against members included membership in and revival of a banned organization; obstructing the laws and Constitution of the country; inciting the masses against the Government; organizing demonstrations critical of the Government's policies; and attempting to infiltrate student bodies to spread the ideology of a banned organization.

On January 8, security forces arrested 13 MB members in Giza. On May 15, security forces arrested 59 MB members, mainly from Alexandria. On September 17, security forces arrested 11 MB members, mostly Zaqaziq University students. On or about October 11, security forces arrested eight MB members in separate incidents at Cairo airport, Minya, and Beni Suef. Among those detained was Ahmed Ezz Iddine of the suspended Al-Shaab newspaper. On December 31, he was released after public calls for his release by the Arab Press Federation. Also during the year, the Government released at least 31 other MB members.

e. Denial of Fair Public Trial

The Constitution provides for an independent judiciary; however, the President may invoke the Emergency Law to refer any criminal case to the Emergency Courts, in which the accused does not receive most of the constitutional protections of the civilian judicial system. The Government has asserted that referral to Emergency Courts usually has been limited to terrorism or national security cases, as well as major cases of

drug trafficking; however, the Government also has occasionally used Emergency Courts to prosecute homosexuals, heterodox religious groups, and political dissidents. Government authorities ignored judicial orders in some cases. The Government has used the Emergency Law, which was established to combat terrorism and grave threats to national security, to try cases outside of this scope.

In May 2003, the Government formally abolished State Security Courts. The courts had been criticized for restricting the rights of defendants, particularly the right to appeal. A number of cases referred to the State Security Courts were transferred to regular criminal courts. However, skeptical observers of the legal system argued that as long as the Government retained and used Emergency Courts, the abolition of State Security Courts did not constitute a fundamental improvement.

The Constitution provides for the independence and immunity of judges and forbids interference by other authorities in the exercise of their judicial functions. This provision generally was observed in practice. The President appoints all judges upon recommendation of the Higher Judicial Council, a constitutional body composed of senior judges. Judges are appointed for life, with mandatory retirement at age 64. Only the Higher Judicial Council may dismiss judges for cause, such as corruption. Headed by the President of the Court of Cassation, the Council regulates judicial promotions and transfers. The Government included lectures on human rights and other social issues in its training courses for prosecutors and judges.

In the civilian court system, there are criminal courts, civil courts, administrative courts, and a Supreme Constitutional Court. There are three levels of regular criminal courts: Primary courts, appeals courts, and the Court of Cassation, which represents the final stage of criminal appeal. Civil courts hear civil cases and administrative courts hear cases contesting government actions or procedures; both systems have upper-level courts to hear appeals. The Supreme Constitutional Court hears challenges to the constitutionality of laws or verdicts in any of the courts.

A lawyer is appointed at the state's expense if the defendant does not have counsel. Appointed lawyers are drawn from a roster chosen by the Bar Association. Defendants can appeal if denied this right; however, detainees in certain high-security prisons continued to allege that they were denied access to counsel or that such access was delayed until trial, thus denying counsel the time to prepare an adequate defense (see Sections 1.c. and 1.d.). A woman's testimony is equal to that of a man's in court. There is no legal prohibition against a woman serving as a judge; however, there has only been one female judge (see Section 5).

In 1992, following a rise in extremist violence, the Government began using military tribunals to adjudicate cases involving persons accused of terrorist activity or membership in terrorist groups. In 1993, the Supreme Constitutional Court ruled that the President may invoke the Emergency Law to refer any crime to a military court. The 1993 ruling in effect removed hundreds of civilian defendants from the normal process of trial by a civilian judge. The Government defended the use of military courts as necessary to try terrorism cases, maintaining that trials in the civilian courts were protracted and that civilian judges and their families were vulnerable to terrorist threats. One case involving civilian defendant Ahmed Hussain Agiza was referred to a military court during the year.

Military verdicts were subject to a review by other military judges and confirmation by the President, who in practice usually delegated the review function to a senior military officer. Defense attorneys claimed that they were not given sufficient time to prepare and that military judges tended to rush cases involving a large number of defendants. Judges had guidelines for sentencing, defendants had the right to counsel, and statements of the charges against defendants were made public. Observers needed government permission to attend. Diplomats attended some military trials during the year. Human rights activists have attended, but only when acting as lawyers for one of the defendants.

On April 27, the Supreme Military Court convicted Ahmad Hussein Agiza, rendered from Sweden in 2001, of crimes in connection with his membership in Islamic Jihad. Agiza was sentenced to 25 years in prison, although in June his sentence was commuted to 15 years. The Swedish Embassy in Cairo closely monitored Agiza's detention conditions in an apparent effort to ensure that he was not mistreated.

The Emergency Courts share jurisdiction with military courts over crimes affecting national security. The President can appoint civilian judges to these courts upon the recommendation of the Minister of Justice or military judges upon recommendation of the Minister of Defense. Sentences are subject to confirmation by the President. There is no right to appeal. The President may alter or annul a decision of an Emergency Court, including a decision to release a defendant.

During the year, Emergency Courts handed down verdicts in three cases. On March 25, the Supreme Emergency Court issued a guilty verdict in the case of 12 members of the Islamic Liberation Party (Hizb al-Tahrir al-Islami). Several of the defendants, including three Britons, alleged they had been tortured to compel

them to sign confessions. Sentences for the group ranged from 1 to 3 years.

On March 11, an Emergency Court acquitted Ashraf Ibrahim and four co-defendants who had been accused of sharing information about human rights abuses with foreign groups and of belonging to the "Revolutionary Socialists" group, alleged to be seeking to overthrow the Government. The co-defendants had been listed as fugitives and remained at large. Ibrahim was arrested in March 2003 following demonstrations against the U.S. invasion of Iraq. Human rights advocates had argued that the Government was persecuting Ibrahim for peaceful political activities (see Section 1.d.).

On March 31, the Supreme Emergency Court sentenced a law student to 15 years of "strict imprisonment" for communicating with a foreign country and offering to provide it with sensitive information.

During the year, the Government continued to try and convict journalists and authors for libel, as well as for expressing their views on political and religious issues (see Sections 2.a. and 2.c.).

According to local human rights organizations, there were approximately 13,000 to 16,000 persons detained without charge on suspicion of illegal terrorist or political activity (see Section 1.d.). In addition, several thousand others were serving sentences after being convicted on similar charges.

The Government did not permit international humanitarian organizations access to political prisoners (see Section 1.c.). In 2002, an AI delegation was permitted to visit the country, but authorities denied the group's request to visit detainees. There were no prison visits by international organizations during the year, although the National Council for Human Rights did conduct a series of prison visits during the second half of the year.

On August 1, the Public Prosecutor Maher Abdel Wahed told the press that the State intended to limit trials in Emergency Courts only to cases that touch upon security of the State. As an example, Abdel Wahed said that a case where two jewelry store robbers had used a bomb was referred to a regular criminal court. Notwithstanding this assertion, the Government initiated Emergency Court proceedings against a self-proclaimed prophet and his followers in December (see Section 2.c.).

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The Constitution provides for the sanctity and secrecy of the home, correspondence, telephone calls, and other means of communication; however, the Emergency Law suspends the constitutional provisions regarding the right to privacy, and the Government used the Emergency Law to limit these rights. Under the Constitution, police must obtain warrants before undertaking searches and wiretaps. Courts have dismissed cases in which warrants were issued without sufficient cause. Police officers who conducted searches without proper warrants were subject to criminal penalties, although penalties seldom were imposed. However, the Emergency Law empowers the Government to place wiretaps, intercept mail, and search persons or places without warrants. Security agencies frequently placed political activists, suspected subversives, journalists, foreigners, and writers under surveillance, screened their correspondence (especially international mail), searched them and their homes, and confiscated personal property.

A telecommunications law allows telephone and Internet wiretaps only by court order. However, some human rights observers alleged that the Government routinely violated this law.

Although the law does not explicitly criminalize homosexual acts, police have targeted homosexuals using Internet-based "sting" operations leading to arrests on charges of "debauchery." There were no reports of new internet entrapment cases during the year (see Sections 1.c, 1.e., and 2.a.).

The Ministry of Interior has the authority to stop specific issues of foreign newspapers from entering the country on the grounds of protecting public order. There were no reports that it had exercised this authority during the year (see Section 2.a.).

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Constitution provides for freedom of speech and of the press; however, the Government partially restricted these rights in practice. The Government used the Emergency Law to infringe on citizens' civil liberties. Citizens openly expressed their views on a wide range of political and social issues, including vigorous criticism of government officials and policies, but generally avoided certain topics, such as direct criticism of the President.

Journalists and writers practiced self-censorship.

In March 2003, the Court of Cassation, ending a long-standing legal case that had broad implications for freedom of expression and human rights advocacy, acquitted Saad Eddin Ibrahim and his codefendants on charges of defaming the State and illegally accepting foreign funds. During the year, Ibrahim and his colleagues resumed their publishing and advocacy operations.

The Constitution restricts ownership of newspapers to public or private legal entities, corporate bodies, and political parties. There are numerous restrictions on legal entities that seek to establish their own newspapers, including a limit of 10 percent ownership by any individual; however, this limit appeared to have been enforced sporadically.

On July 13, the Shura Council's Higher Council for the Press approved the publication of 16 new newspapers; and on December 29, it approved an additional 9 newspapers, including "Al-Ghad," the new publication of the Al-Ghad (Tomorrow) Party.

The Government owned stock in the three largest daily newspapers, and the President appointed their top editors. These papers generally followed the government line. The Government also held a monopoly over the printing and distribution of newspapers, including those of the opposition parties. The Government used its monopoly on newsprint to limit opposition publications.

Opposition political parties published their own newspapers but received a subsidy from the Government and, in some cases, subsidies from foreign interests. Most opposition newspapers were weeklies, with the exception of the dailies Al-Wafd and Al-Ahrar, both of which had small circulation. Opposition newspapers frequently published criticism of the Government. They also gave greater prominence to human rights abuses than did state-run newspapers.

According to a 2003 announcement by the Shura Council, the total number of licensed periodicals in the country was 534, including 64 national papers, 40 opposition party papers, 7 private newspapers, 252 "specialized" publications, 142 scientific journals, and 67 local publications.

In March, the Government lifted its ban on the London-based Arabic newspaper al-Quds al-Araby, and the paper is now back in circulation.

Because of the difficulties in obtaining a license from the Higher Council for the Press, several publishers of newspapers and magazines obtained foreign licenses. The Supreme Constitutional Court still had not reached a decision by year's end on a 1999 legal challenge to the constitutionality of the Information Ministry's practice of censoring offshore publications.

On February 20, then-Minister of Information Safwat El Sherif announced a cabinet decision to limit print runs for foreign-licensed publications to between 5,000 and 25,000 copies, ordered that the papers must pay 36 percent tax on advertising revenues, and prohibited foreign funding.

According to press reports, on June 14 the Administrative Court overturned a decision by the Ministry of Information to prevent a foreign publication from entering the country. The Court clarified that only the Cabinet can place a long-term ban on a foreign publication. The Ministry of Information is empowered only to ban particular issues/editions in the interest of public order.

The Penal Code, Press Law, and Publications Law govern press issues. The Penal Code stipulates fines or imprisonment for criticism of the President, members of the Government, and foreign heads of state. The Press and Publication Laws ostensibly provide protection against malicious and unsubstantiated reporting. In recent years, opposition party newspapers have published within limits articles critical of the President and foreign heads of state without being charged or harassed. However, the Government continued to charge journalists with libel. An editor-in-chief found to be negligent could be considered criminally responsible for libel contained in any portion of the newspaper.

On November 1, unknown assailants detained and beat Abdul Halim Qandil, editor of Al-Araby, the Nasserist opposition party newspaper. Qandil and many others in the media attributed the attack to elements of the State Security apparatus who were angered by Qandil's editorial calls for public opposition to the Government. Qandil had also publicly cast doubt on the MOI's claims to have solved the October 7 bombings that targeted tourist sites in the Sinai.

During the year, the courts tried a number of prominent cases of libel, filed both by government officials and private citizens. On January 28, the Qasr El Nil Court of Misdemeanors sentenced writers Etemad Khorshid and Anis El Degheidy, along with publisher Hassan Ghazal, each to 1 year of imprisonment and LE 1,000 ($160) fine. The Court ruled that the trio had insulted Egyptian actress Sherihan in their book "Witness to the Transgressions of Art and Politics."

On March 14, the Cairo Criminal Court fined Mahmoud El Askalany, a journalist with al-Araby newspaper, LE 20,000 ($3,225) for libel against Minister of Housing Mohammed Ibrahim Soliman. On May 15, lawyers appealed the fine to the Court of Cassation on the grounds that the law does permit criticism of public figures so long as the criticism is limited to public matters of job performance and does not delve into personal issues. By year's end, the Court had still not issued a judgment.

On June 16, the Cairo Criminal Court sentenced tabloid daily al-Osbu'a journalist Ahmed Ezz Eddine to 2 years in prison (with labor) and a fine of LE 20,000 ($3,225) for libel of former Agriculture Minister Wally. Ezz Eddine had written an article accusing Wally of perjury in a corruption case. The former minister contended that the accusation was against his person and not against his capacity as a minister.

On June 27, the Bulaq Aboul Ela Court of Misdemeanors sentenced Mohammed Abu Liwaya of the banned al-Shaab newspaper and Fayez Abdel Hamid of the Parliament News to 6 months' imprisonment, fines of LE 7,500 ($1,209) each, and damages of LE 20,000 ($3,225) for libeling Al-Ahram Chairman Ibrahim Nafei through articles and leaflets.

On July 27, the Cairo Criminal Court fined an editor and journalist of al-Haqiqa newspaper LE 10,000 ($1,612) for libeling the head of the Qussiya City Council.

On September 14, the Cairo Criminal Court began to hear another case of libel filed by Minister of Housing Soliman against three journalists with al-Masri al-Youm. Following questioning by the prosecutor, the three journalists were released on September 21. The case was ongoing at year's end.

In December 2003, Mustafa Bakry, Chief Editor of al-Osbu'a, filed a lawsuit with the office of the Public Prosecutor accusing activist Saad Eddin Ibrahim of working for a foreign government in exchange for financial support. One week later, Ibrahim filed a libel suit against Bakry. The Public Prosecutor's investigation was ongoing at year's end, and the case had still not been referred to trial.

In March and April, four separate courts acquitted or ordered retrials for four unrelated lawsuits against journalists working for al-Osbu'a.

Under the law, the Public Prosecutor may issue a temporary ban on the publication of news related to national security. The length of the ban is based on the length of time required for the prosecution to prepare its case.

In December 2003, the Public Prosecutor issued a press ban on a corruption investigation of the director of the National Heart Institute. The ban continued to limit reporting on the case throughout the year.

The law provides penalties for individuals who disclose information about the State during emergencies, including war and natural disasters. The penalties include fines of up to LE 6,000 ($1,000) and prison sentences of up to 3 years. There were no reports that the law was applied during the year.

The law prohibits current or former members of the police from publishing work-related information without prior permission from the MOI.

The law authorizes various ministries to ban or confiscate books and other works of art upon obtaining a court order. There were no court-ordered book confiscations during the year, but the Government permitted greater confiscatory authority to al-Azhar University.

On May 26, the Islamic Research Center (IRC) at al-Azhar University formally recommended banning four books: Nawal El Sadawi's "The Fall of the Imam"; Iskander Shaheen's "Freemasonry: Religion or Fraud"; Ali Youssef's "The Call of Consciousness"; and Hisham El Bahrani's "City of Miracles." Sadawi's book was first published 20 years ago and has been translated into 14 languages. Although the IRC's recommended bans led to widespread criticism from writers and human rights activists, the Ministry of Justice decided on June 1 to authorize al-Azhar's "inspectors" to seize publications, tapes, speeches, and artistic material that deviated from the IRC's interpretation of Shari'a. Prior to June 1, the IRC could not confiscate books it disapproved without first seeking a court order.

On August 18, the IRC banned "The Responsibility for the Failure of the Islamic State," by Gamal El Banna, a liberal Islamist thinker. The IRC ruled that Gamal El Banna's book deviated from Islamic orthodoxy, and began efforts to confiscate the book from the marketplace.

On October 24, EOHR issued a report which criticized IRC's book confiscations, terming them "a hammer blow to freedom of thought."

In September, the Alexandria Administrative Court heard a lawsuit filed by lawyer Nabih al-Wahsh demanding the confiscation of a book, "The Hijab: A Modernist Approach," by writer Ikbal Baraka. The suit also sought the dismissal of Baraka as chief editor of Hawwa Magazine and her dismissal from the Press Syndicate. The suit alleged that Baraka's book denied the religious sanction for the veiling of women. The suit also charged the ministers of culture, aviation, education, and information, as well as the Grand Imam of al-Azhar University, with having failed to block Baraka's book. A wide cross-section of writers and intellectuals, including Islamist writers, have criticized the effort to ban Baraka's book.

The MOI regularly confiscated leaflets and other works by Islamists and other critics of the State. Members of the illegal Muslim Brotherhood also were arrested in connection with publications (see Sections 1.d. and 3). In many cases, the press reported that police confiscated written materials such as leaflets during the arrests.

Although the MOI has in previous years sporadically prevented specific issues of foreign-published newspapers from entering the country on the grounds of protecting public order, there were no reports of such actions during the year (see Section 1.f.). The Ministry of Defense may ban works about sensitive security issues. The Council of Ministers may order the banning of works that it deems offensive to public morals, detrimental to religion, or likely to cause a breach of the peace.

The Government controlled and censored the state-owned broadcast media. The Ministry of Information owned and operated all ground-based domestic television and radio stations. Two private satellite stations, al-Mihwar and Dream TV, began broadcasting in 2001 and have operated without direct government interference. The Government has a 20 percent financial stake in al-Mihwar and a 10 percent stake in Dream TV. The Government did not block reception of foreign channels via satellite. The percentage of citizens who received satellite television broadcasts has grown steadily but remained small, while many coffee shops and other public places offered satellite television.

Plays and films must pass Ministry of Culture censorship tests as scripts and final productions. The Ministry of Culture censored foreign films to be shown in theaters, but was more lenient regarding the same films in videocassette format. Government censors ensured that foreign films made in the country portrayed the country in a favorable light.

On April 20, the Censorship Department refused to permit public viewing of an American film, "The Code," on grounds that it depicted a gang of outlaws with Arabic names.

Also in June, the Censorship Department formed a committee of cultural figures (both Muslim and Christian) to review a new film ("I Love the Cinema"/ "Bahebb El-Cinma") which told the story of Egypt's Coptic Orthodox minority during the Nasser era. After initial screenings, Muslim and Christian lawyers filed a complaint with the Public Prosecutor, seeking to have the film removed from distribution and the film producers tried for "contempt for religion." There was no final decision by year's end. Audiences were able to see the film at a number of theaters during the year. It was also well received at international film festivals.

In August, the Censorship Department rejected a screenplay by writer Wahid Hamed on the subject of government corruption and influence of the media. Without the Censorship Department's approval, Hamed was unable to proceed with making his film.

Government and private industry experts estimated that approximately 3.8 million persons in the country used the Internet. The Government did not restrict Internet use, but selectively monitored Internet use (see Section 1.f.).

On May 15 and again on September 1, the Muslim Brotherhood website became temporarily unavailable to Egyptian Internet users. Since the May outage corresponded to the arrest of 59 MB members, there was widespread belief that the security services shut down the website.

The Government did not explicitly restrict academic freedom at universities; however, the Government selected deans rather than permitting the faculty to elect them. The Government justified the measure as a means to combat Islamist influence on campus. Unlike in the past, the Government did not ban books for use on

campuses during the year.

b. Freedom of Peaceful Assembly and Association

The Constitution provides for freedom of assembly and association; however, the Government significantly restricted freedom of assembly. Citizens must obtain approval from the MOI before holding public meetings, rallies, and protest marches. Many demonstrations were not approved, and the Government tightly controlled public demonstrations that did occur. However, on December 12, 300 activists from the Kifaya (Enough) movement staged a protest against President Mubarak running for a fifth term in office. There was little direct government interference in the December 12 demonstration, although security personnel significantly outnumbered demonstrators (see Section 3). The MOI selectively obstructed some meetings scheduled to be held on private property and university campuses (see Section 4).

On a number of occasions, worshippers at the Al-Azhar mosque in Central Cairo held mainly impromptu demonstrations at the conclusion of Friday prayers. These were tolerated but carefully watched by the Government.

Some smaller anti-Iraq war demonstrations were held with and without permission. In both cases, the Government deployed large numbers of security personnel to contain the demonstrations. In a number of unauthorized demonstrations, police detained suspected organizers, some of whom alleged mistreatment while in detention (see Sections 1.c. and 1.d.).

The Constitution provides for freedom of association; however, the Government significantly restricted it in practice. The Minister of Insurance and Social Affairs has the authority to dissolve NGOs by decree. The law also requires NGOs to obtain permission from the Government before accepting foreign funds. According to government officials, funds from foreign government donors with established development programs in the country were excluded from this requirement.

During the year, a number of organizations active in human rights advocacy and civil society development were allowed to register and thus became officially recognized. However, several other groups, including the Egyptian Association Against Torture, the Center for Housing Rights, and the Word Center, continued to be denied registration as NGOs. On October 25, the Governor of Aswan issued an administrative decree dissolving the board of directors of the Aswan-based Association for Health Development and the Environment and appointed a new board. The association's leadership countered with a lawsuit against the Governor, charging that his act was in direct contradiction to the NGO law (Act 84 of 2002). In at least two cases, obscure "security objections" were cited in their rejection letters. These groups were challenging these decisions at year's end.

On January 29, the Ministry denied the application for registration of a human rights NGO in Qena Governorate. In January, a MB member, Mukhtar Nouh, who had spent 3 years in prison, sought to register a NGO called "The Association for the Protection of Constitutional Values." The 18-member board consisted exclusively of lawyers. The Association's plan was to be limited to lawyers and to work, independently of the Bar Syndicate, to improve the profession and promote liberal ideas, and to improve the status of women and Coptic Christians. On July 7, the Association's lawyers appealed to the courts after the Ministry of Social Affairs rejected the application. The case was still pending at year's end.

On February 8, an Administrative court ordered the Ministry to approve and register the "Sons of the Land Association for Human Rights." The Court ruled that the new organization had met all registration requirements and did not pose a security threat. The Ministry registered the organization, and it was functioning at year's end.

In June, the "Sawasiya Center for Human Rights and Anti-Discrimination" registered as a regional NGO with a board of 15 prominent Arab personalities from the region and Europe. The center's Executive Director, Abdel Moneim Abdel Maksoud, is a leading member of the MB, as well as its lawyer. Abdel Maksoud told the press that Sawasiya included various political thinkers from around the world and that it was not directly or indirectly affiliated with the MB.

In May, 18 human rights organizations signed an agreement establishing the Egyptian Human Rights Organization collective. On July 3, 14 human rights groups announced the formation of a national federation of human rights NGOs. In October, three leading NGOs (HRAAP, the Arab Center for the Independence of the Judiciary, and the Group for Democratic Development) established the "Alliance for Democracy and Reform."

In September 2003, the "New Woman Center for Research," a human rights group previously denied

registration by the Ministry of Social Affairs, won a court judgment ordering the Ministry to allow it to register as an NGO. The Ministry implemented the judgment 1 year later in September (see Section 4).

Under legislation governing professional syndicates, at least 50 percent of the general membership of an association must elect the governing board. Failing a quorum, a second election must be held in which at least 30 percent of the membership votes for the board. If such a quorum is unattainable, the judiciary may appoint a caretaker board until new elections can be scheduled. The law was adopted to prevent well-organized minorities, specifically Islamists, from capturing or retaining the leadership of professional syndicates. Members of the syndicates have reported that Islamists have used irregular electoral techniques, such as physically blocking polling places and limiting or changing the location of polling sites.

c. Freedom of Religion

The Constitution provides for freedom of belief and the practice of religious rites; however, in practice the Government placed restrictions on these rights. The Constitution provides that Islam is the official state religion and the primary source of legislation. Religious practices that conflict with Islamic law (Shari'a) are prohibited. However, significant numbers of the Christian and Jewish minorities worshipped without harassment and maintained links with coreligionists in other countries.

Most citizens (approximately 90 percent) are Sunni Muslims. There is a very small number (a fraction of 1 percent) of Shi'a Muslims. Approximately 10 percent of the population are Christian, the majority of whom belong to the Coptic Orthodox Church. There are other small Christian denominations, a small Baha'i community, and a Jewish community of approximately 200 persons.

All mosques must be licensed, and the Government was engaged in an effort to control them. The Government appointed and paid the salaries of the imams who led prayers in mosques, proposed themes for them, and monitored their sermons. In 2003, Dr. Hamdy Zaqzouq, Minister of Religious Endowments, said there were 30,000 imams in the country, who preached at 82,000 mosques and zawaya (smaller prayer halls in private buildings). He said that his ministry annexed approximately 6,000 unregistered mosques and zawaya every year.

Neither the Constitution nor the Civil and Penal Codes prohibit proselytizing or conversion; however, the Government discouraged proselytizing to non-Muslims, and those who did so risked prosecution under the Penal Code, which prohibits citizens from ridiculing or insulting heavenly religions or inciting sectarian strife.

There were no restrictions in practice on the conversion of non-Muslims to Islam; however, in cases involving conversion of Muslims to Christianity, the Government generally denied requests by converts to amend civil records to reflect their new religious status. The law prescribes steps to register the conversion of non-Muslims to Islam, but does not recognize the conversion of Muslims to other religions. Some converts resorted to changing their documents themselves, or bribing a civil servant to do so. Authorities have charged several converts with violating laws prohibiting the falsification of documents. In such instances, converts have themselves altered their identification cards and other official documents to reflect their new religious affiliation because of fear of government harassment if they officially registered the change from Islam to Christianity. For example, in 2002, Malak Fahmi, a Christian, and his wife Sarah, a Christian convert from Islam, were arrested while attempting to leave the country with their two children. The couple was charged with falsification of documents. Sarah, who changed her name and religious affiliation on her marriage certificate only, reportedly stated that she did so without her husband's assistance. The couple was released from prison in February, but was awaiting trial on charges of document fraud. At year's end, there had been no developments in the case.

Converts to Islam are not permitted to revert to their original religion. The minor children of converts to Islam, and in some cases adult children, may automatically become classified as Muslims in the eyes of the state regardless of the status of the other spouse. This automatic classification is in accordance with established Shari'a rules, which dictate "no jurisdiction of a non-Muslim over a Muslim."

In some cases, converts reported being subjected to harassment from the Government, including regular questioning and restriction of travel abroad. Converts from Islam to Christianity continued to report societal discrimination.

Hisham Samir Abdel Lateef Ibrahim, a convert to Christianity first detained in 2002 and believed to have been charged with "forging identity documents" and "contempt of religion," was reportedly released during the year but remained on probation.

Repairs to all places of worship are subject to a 1976 civil construction code which governs church repairs. The

decree was significant symbolically because it made churches and mosques equal under the law. Christians reported that local permits still were subject to approval by security authorities.

Although the Official Gazette only publicized government issuance of less than a dozen church construction and repair permits during the year, government officials asserted that most permits were not published in the Official Gazette, and said that they issued 254 permits for building and repair of churches between January 1 and June 15.

The approval process for church construction suffered from delays and was considered to be insufficiently responsive to the Christian community, although the President reportedly approved all requests for permits that were presented to him. The incidence of blocked or delayed orders varied, often depending on the church's relationship with local security officials and the level of support of the local governor. Christian activists, including church officials, consistently remarked that regardless of the formal approval process and the stated support of senior government officials for church construction, local officials in some governorates opted to take an uncooperative and obstructionist approach to church construction and repair.

The Constitution requires schools to offer religious instruction. Public and private schools provided religious instruction according to the faith of the student.

The Government occasionally prosecuted members of religious groups whose practices deviated from mainstream Islamic beliefs and whose activities were believed to jeopardize communal harmony. On January 28, a State Security Emergency Court reduced the sentences of Sayed Tolba and 20 of his associates to time served. They were convicted 2002 on the charge of insulting heavenly religions, as a result of Tolba's claim that he was a prophet and could cure illnesses.

On December 1, the Public Prosecutor referred 13 individuals to trial by a State Security Emergency Court on charges of insulting heavenly religions. The leader of the 13, who were arrested in August in Qaloubiya, was Ahmed Ibrahim Abou Shousha, who had asserted that he was a prophet on par with the Prophet Mohammad. Shousha had called for various innovations on orthodox Islamic practice.

In December 2003, State Security Court forces arrested and detained without charge 20 suspected Shi'a Muslim citizens, reportedly due to concerns that they were a threat to petroleum facilities and were engaging in anti-State activity. A leading Egyptian civil rights group reported that the authorities tortured several in the group before releasing 16 of them. The four remaining detainees were held at Wadi Natroun prison. Three detainees were released in August, although Mohammad Ramadan El Dereiny remained in custody at year's end.

The Islamic Research Center of Al-Azhar University has authority to recommend that the Government censor books on religious grounds (see Section 2.a.).

The Constitution provides for equal public rights and duties without discrimination based on religion or creed; however, discrimination against minority religions, including Christians and Baha'is, existed. There were no Christians serving as governors, police commissioners, city mayors, public university presidents, or deans. There were few Christians in the upper ranks of the security services and armed forces. Discrimination against Christians also continued in public sector employment; in staff appointments to public universities; in failure (with the exception of one case in 2002) to admit Christians into public university training programs for Arabic language teachers that involved study of the Koran; and in payment of Muslim imams through public funds (Christian clergy are paid with private church funds).

There were no new reports of violent assaults by Gama' al-Islami (Islamic Group, IG) or other suspected terrorists against the approximately 7 million Coptic Christians. In a number of cases where victims alleged violence to be driven by sectarian tensions, particularly regarding murder, it was difficult to determine whether religion was a factor.

The prosecution failed to bring a successful case against those alleged to be responsible for the killing of 21 Christians during sectarian strife in early 2000 in the town of al-Kush, in Sohag Governate, Upper Egypt. On June 14, the Court of Cassation, the country's highest appellate court, upheld the acquittal of 94 of 96 suspects who were charged with various offenses committed in this incident. The Court's decision left no further legal options.

In the investigation of an earlier incident in al-Kush in 1998 involving the killing of two Coptic Christians, police detained hundreds of citizens that same year, including relatives of suspects, women, and children. Local observers reported that many of these detainees were subjected to torture and mistreatment. An investigation of police torture of the mostly Christian detainees made little progress and has appeared effectively closed since 2001. Shayboub William Arsal, a Coptic Christian, was convicted and sentenced for the two murders and

his appeal, which has been pending for 4 years, has not been heard. The local Christian community believes that Shayboub was accused and convicted of the crime because of his religion.

In January, Christian workers at the Patmos Center, a Coptic Orthodox social service facility on the Suez road east of Cairo, confronted soldiers and an army bulldozer dispatched from a military base adjacent to the facility. During the confrontation, one of the Christian workers was fatally struck by a private bus attempting to drive around the crowd. This incident was the latest in a series involving Patmos and the neighboring military base. The army's reported motive for bulldozing the gate was that the Patmos Center's wall stands 50 meters from the highway, while local zoning regulations require a distance of 100 meters. Christian sources noted that the army base's perimeter wall also is only 50 meters from the road, and they charged that the army's intent was to harass the Christians until they left the site so that it could be annexed by the military. Other observers believed the military's enmity was engendered by the "stealthy" way the church developed a Christian service facility on a site originally billed as an agricultural "desert reclamation project." The controversy subsided, and the Patmos gate remained in its original location.

There were reports of forced conversions of Coptic girls to Islam. Reports of such cases were disputed and often included inflammatory allegations and categorical denials of kidnapping and rape. Observers, including human rights groups, found it extremely difficult to determine whether compulsion was used, as most cases involved a Coptic girl who converted to Islam when she married a Muslim man. According to the Government, in such cases the girl must meet with her family, with her priest, and with the head of her church before she is allowed to convert.

However, there were credible reports of government harassment of Christian families that attempted to regain custody of their daughters. The law states that a marriage of a girl under the age of 16 is prohibited. Between the ages of 16 and 21, marriage is illegal without the approval and presence of her guardian. The authorities also sometimes failed to uphold the law in cases of marriage between underage Christian girls and Muslim boys.

There is no legal requirement for a Christian girl or woman to convert to Islam in order to marry a Muslim man. However, if a Christian woman marries a Muslim man, the Coptic Orthodox Church excommunicates her. Ignorance of the law and societal pressure, including the centrality of marriage to a woman's identity, often affect her decision. Family conflict and financial pressure also are cited as factors. Conversion is regarded as a disgrace to the convert's family, so most Christian families would object strongly to a daughter's wish to marry a Muslim. If a Christian girl converts to Islam, her family loses guardianship, which transfers to a Muslim custodian, who is likely to grant approval.

Anti-Semitism is found in both the pro-government and opposition press; however, there have been no violent anti-Semitic incidents in recent years.

Anti-Semitic articles and opinion pieces in the print media and editorial cartoons appeared in the press and electronic media. For example, on March 18, Abdelwahab Ads, deputy editor of Al Jumhuriya, accused the Jews of the terrorist attack in Madrid on March 11 as well as of the September 11, 2001 attacks in the U.S.

On June 24 and July 1, the National Democratic Party (NDP) newspaper al-Lewa al-Islami published articles by Professor Refaat Sayed Ahmed in which he denied the Holocaust. On August 25, the NDP announced that it had banned Professor Ahmed from future publishing, that the editor who approved his article had been fired, and that the NDP and the Government rejected anti-Semitism and acknowledged the reality of the Holocaust.

The Government reportedly advised journalists and cartoonists to avoid anti-Semitism. Government officials insisted that anti-Semitic statements in the media were a reaction to Israeli government actions against Palestinians and did not reflect historical anti-Semitism; however, there were relatively few public attempts to distinguish between anti-Semitism and anti-Israeli sentiment.

On January 5, the Supreme Administrative Court upheld a 2001 lower court decision to recommend the cancellation of the Abu Hasira festival (for Jewish pilgrims) in the Beheira Governorate. In 2003, the Ministry of Culture designated Abu Hasira's tomb as a "historic site" and ruled that an annual festival could be held. Villagers around the shrine protested, claiming that the Jewish visitors aggravated the locals with their drinking. There were reports in December, however, that Jewish pilgrims were again welcome to celebrate the Abu Hasira festival, scheduled for early January 2005.

In December 2003, following international expressions of concern, the special collections section of the Alexandria Library removed a copy of "The Protocols of the Elders of Zion" from a display of religious manuscripts. In a statement, the director of the library denied allegations that the book had been displayed next

to the Torah, but nonetheless stated that its inclusion was a "bad judgment" and regretted any offense the incident might have caused.

Law 263 of 1960, which is still in force, bans Baha'i institutions and community activities. During the Nasser era, the Government confiscated all Baha'i community properties, including Baha'i centers, libraries, and cemeteries. The problems of Baha'is, who number fewer than 2,000 persons in the country, have been compounded since the MOI began to upgrade its automation of civil records, including national identity cards. The Government asserted that its new software requires all citizens to be categorized as Muslims, Christians, or Jews, although some Baha'is initially received identity cards which listed their religion as "other." During the year, Baha'is and other religious groups who did not choose to describe themselves as Muslim, Christian, or Jewish, were compelled either to misrepresent themselves as members of one of these three religions, or to go without valid identity documents, passports, birth and death certificates, and marriage licenses. Most Baha'is have chosen the latter course. The Government's unwillingness to issue Baha'is identity cards and other necessary documents made it increasingly difficult for Baha'is to register their children in school, to open bank accounts, and to register businesses. At year's end, some Baha'is reported that government representatives had offered them passports, but no other documents. The Baha'i leadership noted that while this would enable them to leave the country, it would not facilitate their continued residence in the country.

For a more detailed discussion, see the 2004 International Religious Freedom Report.

d. Freedom of Movement within the Country, Foreign Travel, Emigration, and Repatriation

The law provides for these rights, and the Government generally respected them in practice; however, there were some notable exceptions. Citizens and foreigners were free to travel within the country, except in certain military areas. Males who have not completed compulsory military service may not travel abroad or emigrate, although this restriction may be deferred or bypassed under special circumstances. Unmarried women under the age of 21 must have permission from their fathers to obtain passports and travel. Married women no longer legally require the same permission from their husbands; however, in practice police reportedly still required such permission in most cases (see Section 5). Citizens who leave the country had the right to return.

The Constitution prohibits forced exile, and the Government did not use it during the year.

The Constitution includes provisions for the granting of refugee status or asylum to persons who meet the definition in the 1951 U.N. Convention Relating to the Status of Refugees and its 1967 Protocol; however, the Government limited the ease with which the refugee population could integrate locally. The Government generally did not issue work permits to refugees. The Government admitted refugees on the understanding that their presence in the country was temporary. Because the country lacked national legislation or a legal framework governing the granting of asylum, the Office of the U.N. High Commissioner for Refugees (UNHCR) assumed full responsibility for the determination of refugee status on behalf of the Government. The Government generally cooperated with the UNHCR and treated refugees in accordance with minimum standards and agreed arrangements. The UNHCR provided recognized refugees with a refugee identification card that was considered a residence permit and bore the stamp of the national authorities. Refugees generally may not obtain citizenship.

During the year, approximately 9,000 recognized refugees, the majority of whom were Sudanese, resided in the country. In addition, 70,000 Palestinian refugees are registered with government authorities. There were also approximately 16,000 asylum seekers awaiting status determination. Although there was no pattern of abuse of refugees, during random security sweeps the Government temporarily detained some refugees who were not carrying proper identification. Following intervention by the UNHCR, the refugees were released.

There were occasional reports that human rights activists were briefly detained for questioning at international ports of entry/departure. On May 19, Cairo airport security personnel prohibited four members of a delegation from the Egyptian Center for Housing Rights from traveling to Thailand to attend a workshop. The delegation canceled its trip and complained to the Ministry of Interior, but it never learned the reason for the ban.

Also during the year, the security services prevented three members of the MB (Essam El Erian, Abdel Hamid El Ghazaly, and Mohsen Radi), as well as MB-affiliated journalist Ahmed Ezz Eddine, from traveling to meetings outside the country (see Section 4).

The disappearance of Yemeni dissident Ahmed Salem Ebeid, who EOHR alleged was sent by the Government to Yemen, may have involved the forced return of a person to a country where he feared prosecution (see Section 1.b.).

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

Citizens did not have the meaningful right to change their government. The ruling National Democratic Party (NDP) dominated the 454-seat People's Assembly, the 264-seat Shura Council, local governments, the mass media, labor, and the large public sector, and controlled the licensing of new political parties, newspapers, and private organizations to such an extent that, as a practical matter, citizens did not have a meaningful ability to change their government.

In 1999, President Hosni Mubarak was elected unopposed to a fourth 6-year term in a national referendum. According to official results, he received 94 percent of the vote. Mubarak had been previously nominated by the People's Assembly. Under the Constitution, the electorate is not presented with a choice among competing presidential candidates. In October, political activists and opposition political party members called for constitutional revisions to change from referendum to multiple-candidate presidential elections and term limits. On December 12, 300 activists from the Kifaya (Enough) movement staged a protest against President Mubarak running for a fifth term in office. There was little government interference (see Section 2.b.).

Despite the overall improvement in the 2000 electoral process (as compared to the 1995 parliamentary elections), there still were problems affecting the fairness of the 2000 parliamentary elections. Preceding the elections, the Government arrested thousands of MB members on charges of belonging to an illegal organization. Most observers believed that the Government was seeking to undermine the MB's participation in the People's Assembly and professional syndicate elections through intimidation.

The People's Assembly debated government proposals, and members exercised their authority to call cabinet ministers to explain policy. The executive initiated almost all legislation. The Assembly exercised limited influence in the areas of security and foreign policy, and retained little oversight of the MOI's use of Emergency Law powers. Many executive branch initiatives and policies were carried out by regulation through ministerial decree without legislative oversight. Individual voting records were not published, and citizens had no independent method of checking a member's voting record.

The Shura Council, the upper house of Parliament, has 264 seats. Two-thirds of the members were elected and one-third were appointed by the President. In 2001, President Mubarak appointed 45 members to the Shura Council, including 8 women and 4 Christians.

In May and June, Shura Council elections resulted in the NDP winning 70 of 88 open seats. Independents won 17 seats. One of the independents, from Giza, is widely known to be a member of the officially banned MB. The opposition Tagammu (Grouping) Party won a solitary Shura seat.

There were 18 recognized opposition parties, not all of which were active.

The Political Parties Committee (PPC) approves applications by prospective parties and may withdraw recognition from existing parties. The Labor Party, which lost recognition in 2000, remained suspended at year's end (see Section 2.a.). During the September National Democratic Party Conference, the party leadership announced a plan to seek People's Assembly approval in November to relax the political party registration process. By year's end, the PPC had approved two new parties, including the Al-Ghad (Tomorrow) Party.

In addition, during the year, a variety of other aspirant political parties sought legal recognition from the courts or the PPC. The PPC rejected the Wasat (Middle) Party on the grounds that it illegally sought to establish a party with an Islamic basis. The PPC rejected the Karama (Dignity) Party on the grounds that its platform was not sufficiently different from other existing parties. By year's end, the International Peace Party and the Nationalist Party had also been denied. The Egypt Motherland, the Democratic Wafd, and the Progressive Arab parties' applications remained pending.

On June 2, the Abdeen Appeals Court placed the Ahrar (Liberal) Party and its 18 publications under judicial sequestration and appointed a custodian to oversee the financial and administrative functions of the party. Since 1998, 13 members have competed for the chairmanship, with 6 holding general conferences and claiming to have been legitimately elected. The PPC did not recognize any of the results. An appeal against the sequestration was pending at year's end.

The law prohibits political parties based on religion, and the MB remained an illegal organization; however, MB members openly and publicly spoke their views, although they did not explicitly identify themselves as members of the organization. They remained subject to government pressure (see Section 1.d.). Seventeen candidates affiliated with the MB were elected to the People's Assembly as independents in 2000. One of the

17 was unseated in 2003, when Gamal Heshmat lost a by-election. There were reports of heavy-handed police interference on polling day in favor of his opponent.

There were 11 women in the 454-seat People's Assembly. Two women served among the 32 ministers in the Cabinet. In 2003, the Government appointed a female jurist to serve on the Supreme Constitutional Court. She became the first female citizen to serve on the bench.

There were 7 Christians in the 454-seat People's Assembly and 2 Christians in the 32-member Cabinet.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

Government restrictions on NGO activities, including limits on organizations' ability to accept funding, continued to limit reporting on human rights abuses. Government officials were selectively cooperative and responsive to NGO views. Some human rights activists were briefly detained for questioning at international ports of entry (see Section 2.d.).

In 2002, the Government passed a law governing the regulation and operation of all NGOs operating in the country. The law and its subsequent implementing regulations drew criticism from local NGOs and international activists. Some charged that the law and regulations placed unduly burdensome restrictions on NGO operations. Of particular concern was a new provision in the law that granted the Minister of Social Affairs the authority to dissolve an NGO by decree, rather than requiring a court order.

In 2003, the Parliament passed legislation establishing the National Council for Human Rights (NCHR), which became operational early in the year. The Council is composed of 25 members and headed by a chairman and a deputy, who serve 3-year terms. The Council's mandate is to receive human rights complaints and request competent government authorities to investigate them, to consult with the Government on the development of legislation that promotes good human rights practices, to increase public awareness on human rights, to issue an annual report on human rights in the country, and coordinate and network with other entities focused on human rights.

Observers have complained about the Council's slow start and modest results achieved to date. At year's end, the Council had received budgetary support from the Government as well as the European Union. Reliable reports indicated that the NCHR received over 4,000 complaints. NCHR reported that it referred an unspecified number of the complaints that it deemed credible to relevant authorities, but by year's end had received replies on only 50 cases.

Public visibility of the NCHR's activities was generally low, but increased over the course of the year. In October, for example, Council Vice Chairman Dr. Kamal Abul Magd, after visiting Tora and Abu Zaabal prisons, suggested there had been some improvement in prison conditions, but stressed the Council's determination to seek guarantees against preventive detention. In December, NCHR publicly announced that it would urge the Government, in its annual report to be issued in early 2005, to abolish the Emergency Law, on the grounds that ordinary constitutional law is sufficient to meet the country's security requirements.

In June 2003, years after it first applied, the EOHR was officially registered. HRAAP, another established and credible human rights group, also successfully registered. At least three human rights groups remained unable to operate during the year due to 2003 government decisions to deny their registration for obscure "security reasons." The status of some others was pending at year's end (see Section 2.b.).

In November 2003, the Arab Program for Human Rights Activists and the Word Center for Human Rights announced the rejection by the Ministry of Social Affairs of the Word Center's application for NGO status, citing "security objections." The Ministry also contended that the Center is a group based on religion and therefore not eligible for NGO status under the NGO Law (Law 84/02). The Word Center previously had applied for recognition as a "social company" by the Ministry of Foreign Trade and Industry. This option, which has been the resort of other NGO-like groups denied registration under the NGO law, can afford basic legal recognition. The Word Center's "social company" application was accepted in 1996; and the Center operated without restriction. The Word Center has filed suit against the Ministry of Social Affairs for recognition as an NGO and its case was pending at year's end.

EOHR and other groups obtained limited cooperation of government officials in visiting some prisons in their capacity as legal counsel, but not as human rights observers. They received funding from foreign human rights organizations.

During the year, the Government permitted the Cairo Institute for Human Rights Studies (CIHR) and other human rights organizations, including HRAAP, EOHR, and the Arab Center for Independence of the Judiciary, to hold and participate in international conferences.

The Government at times cooperated with international organizations; however, according to the delegate to the 2003 session of the U.N. Committee Against Torture, the Government had not agreed to a requested visit by the UNCHR Special Rapporteur on Torture because of an incompatibility of timetables (see Section 1.c.).

On July 25, inspectors from the Ministry of Health visited the premises of the El Nadim Center for the Rehabilitation of the Victims of Torture. This inspection visit provoked domestic and international concerns that the Government was harassing this human rights organization. (The El Nadim Center was not registered as an NGO with the Ministry of Social Affairs but was registered as a medical clinic, and thus falls under Ministry of Health jurisdiction.) The inspectors confiscated equipment and personal papers of doctors and well as patients, and soon after the inspection, one volunteer doctor at the Center was transferred from his position as the Director of the Airport Hospital for Mental Health to a department at the Khanka Hospital. El Nadim lodged a formal complaint with the Office of the Public Prosecutor, and HRW addressed a letter to President Mubarak requesting his immediate intervention to stop the harassment. By late September, the Ministry of Health had halted its inquiry, and the Nadim Center was proceeding with its work.

Section 5 Discrimination, Societal Abuses, and Trafficking in Persons

The Constitution provides for equality of the sexes and equal treatment of non-Muslims; however, aspects of the law and many traditional practices discriminated against women and religious minorities.

Women

The law does not prohibit spousal abuse; however, provisions of law relating to assault in general are applied. Domestic violence against women was a significant problem and was reflected in press accounts of specific incidents. In 2003, the Center for Egyptian Women's Legal Affairs conducted a survey of women, based in part on an assessment of crime reports in the vernacular press over a 6-month period, which estimated that 67 percent of women in urban areas and 30 percent in rural areas had been involved in some form of domestic violence at least once between 2002 and 2003. Among those who had been beaten, less than half had ever sought help. Due to the value attached to privacy in the country's traditional society, abuse within the family rarely was discussed publicly. Spousal abuse is grounds for a divorce; however, the law requires the plaintiff to produce eyewitnesses, a difficult condition to meet. Several NGOs offered counseling, legal aid, and other services to women who were victims of domestic violence. Activists believed that in general the police and the judiciary considered the "integrity of the family" more important than the well being of the woman. The Ministry of Insurance and Social Affairs operated more than 150 family counseling bureaus nationwide, which provided legal and medical services.

The National Council for Women (NCW) proposed and advocated policies that promoted women's empowerment and also designed development programs that benefit women. The Office of the National Ombudsman for Women provided assistance to women facing discrimination in employment and housing, domestic violence, sexual assault, and child custody disputes.

The law prohibits non-spousal rape; however, spousal rape is not illegal. The Government prosecuted rapists, and punishment for rape ranges from 3 years to life imprisonment. Although reliable statistics regarding rape were not available, activists believed that it was not uncommon, despite strong social disapproval. If a rapist is convicted of abducting his victim, he is subject to execution.

The law does not specifically address "honor" crimes (violent assaults by a male against a female, usually a family member, with intent to kill because of perceived lack of chastity). In practice, the courts sentenced perpetrators of such crimes to lesser punishments than those convicted in other cases of murder. There were no reliable statistics regarding the extent of honor killings; however, it was believed that they were not common.

FGM remained a serious, widespread problem, despite the Government's attempts to eliminate the practice and NGO efforts to combat it. Traditional and family pressures remained strong. A study conducted in 2000 estimated 97 percent of women who have ever been married had undergone FGM. The Government supported efforts to educate the public about FGM; however, illiteracy impeded some women from distinguishing between the deep-rooted tradition of FGM and religious practices. Moreover, many citizens believed that FGM was an important part of maintaining female chastity, and the practice was supported by some Muslim religious authorities and Islamist political activists. FGM was equally prevalent among Muslims and Christians.

Prostitution and sex tourism are illegal but continued to occur, particularly in Cairo and Alexandria.

Sexual harassment is not prohibited specifically by law. There were no statistics available regarding its prevalence.

The law provides for equality of the sexes; however, aspects of the law and many traditional practices discriminated against women. By law, unmarried women under the age of 21 must have permission from their fathers to obtain passports and to travel. Married women do not require such permission, but police sometimes did not apply the law consistently. A woman's testimony is equal to that of a man's in court.

There is no legal prohibition against a woman serving as a judge. In February, Counselor Tahany al-Gabbani was appointed to the Supreme Constitutional Court, the first, and only, female citizen to be appointed to the bench. At year's end, the Court of Cassation still was examining the cases of two female attorneys, Fatma Lashin and Amany Talaat, who challenged the Government's refusal to appoint them as public prosecutors. As of October, their challenge was still pending.

On September 5, the Minister of Awqaf (Religious Endowments) for the first time appointed a woman to the position of General Manager at the Waqf Authority.

Laws affecting marriage and personal status generally corresponded to an individual's religion. Article 20 of the Procedural Personal Status Law of 2000 provides for khul' divorce, which allows a Muslim woman to obtain a divorce without her husband's consent, provided that she is willing to forego all of her financial rights, including alimony, dowry, and other benefits. However, in practice, some judges have not applied the law accurately or fairly, causing lengthy bureaucratic delays for the thousands of women who have filed for khul' divorce. Many women have also complained that after being granted khul', the required child alimony is not paid.

The Coptic Orthodox Church permits divorce only in specific circumstances, such as adultery or conversion of one spouse to another religion.

Under Islamic law, non-Muslim males must convert to Islam to marry Muslim women, but non-Muslim women need not convert to marry Muslim men. Muslim female heirs receive half the amount of a male heir's inheritance, while Christian widows of Muslims have no inheritance rights. A sole female heir receives half her parents' estate; the balance goes to designated male relatives. A sole male heir inherits all of his parents' property. Male Muslim heirs face strong social pressure to provide for all family members who require assistance; however, in practice this assistance was not always provided.

Labor laws provide for equal rates of pay for equal work for men and women in the public sector. According to government figures from 2003, women constituted 17 percent of private business owners and occupied 25 percent of the managerial positions in the four major national banks. Educated women had employment opportunities, but social pressure against women pursuing a career was strong. Women's rights advocates claimed that Islamist influence inhibited further gains. Women's rights advocates also pointed to other discriminatory traditional or cultural attitudes and practices, such as FGM and the traditional male relative's role in enforcing chastity.

A number of active women's rights groups worked to reform family law, educate women on their legal rights, promote literacy, and combat FGM.

Children

The Government remained committed to the protection of children's welfare; however, in practice, the Government made little progress in eliminating FGM, affording rights to children with foreign fathers, and helping street children.

The Government provided public education, which is compulsory for the first 9 academic years (typically until the age of 15). The Government treated boys and girls equally at all levels of education. The Education Minister asserted that 98 percent of citizen children were enrolled in compulsory education through grade nine. Approximately 30 percent of citizen students pursued studies at the post-secondary level.

The Government provided medical care for all children, regardless of gender.

The Child Law provides for privileges, protection, and care for children in general. Six of the law's 144 articles set rules protective of working children (see Section 6.d.).

In May 2003, the Suggestions and Complaints Committee of the People's Assembly approved a draft law that would allocate special holding cells for minors at police stations. The proposal had not been adopted by the entire Parliament at year's end.

Children with foreign fathers were not considered citizens and therefore could not attend public school or state universities. They were also barred from certain professional schools and could not work without meeting foreign residency requirements and obtaining work permits. There were an estimated 400,000 such children in the country.

FGM remained a serious problem and was widely performed (see Section 5, Women).

During the year, the country's National Council of Childhood and Motherhood (NCCM), a government organ, developed a national plan to increase educational opportunities for girls, to combat the worst forms of child labor (in collaboration with the ILO), and to implement a reproductive health awareness program for public schools. At year's end, implementation was underway.

Trafficking in Persons

The law does not specifically prohibit trafficking in persons; however, other portions of the criminal code may be used to prosecute traffickers. There were anecdotal and press reports of trafficking of persons from sub-Saharan Africa and Eastern Europe through the country to Europe and Israel. There have been press reports about foreigners trying to cross over to Israel seeking employment there. It is difficult to determine with precision how many of the aliens smuggled through the country were actually being trafficked and how many were voluntary economic migrants. The Government aggressively patrolled its borders to prevent alien smuggling, but geography and resource limitations precluded total success. Government officials participated in international conferences on combating trafficking in persons.

Persons with Disabilities

There are no laws specifically prohibiting discrimination against persons with physical or mental disabilities, but the Government made serious efforts to address their rights. It worked closely with U.N. agencies and other international aid donors to design job-training programs for persons with disabilities. The Government also sought to increase the public's awareness of the capabilities of persons with disabilities in television programming, the print media, and educational material in public schools. There were approximately 5.7 million persons with disabilities, of whom 1.5 million were disabled severely.

The law provides that all businesses must designate 5 percent of their jobs for persons with disabilities who are exempt from normal literacy requirements. Although there was no legislation mandating access to public accommodations and transportation, persons with disabilities may ride government-owned mass transit buses free of charge, are given priority in obtaining telephones, and receive reductions on customs duties for private vehicles. A number of NGOs were active in efforts to train and assist persons with disabilities.

Other Societal Abuses and Discrimination

In February 2003, a court rejected the appeal of foreign national Wissam Toufic Abyad, who had been convicted of "habitual debauchery" after arranging to meet a police informant posing as a homosexual man on an internet site. Abyad, serving a 15-month sentence, was unable to get his case heard by the Court of Cassation. He was released in May.

In February 2003, a Court of Appeal in Agouza, Cairo upheld the 3-year sentences of 11 allegedly homosexual men convicted of "habitual debauchery." A twelfth defendant was tried in juvenile court and later sentenced to 2 years' imprisonment. Lawyers for the 12 appealed the case to the Court of Cassation, but no court hearing date had been set, and the 12 remained in prison during the year.

Individuals suspected of homosexual activity and arrested on "debauchery" charges regularly reported being subjected to humiliation and abuse while in custody.

In March, the HRW Executive Director visited the country to unveil the new report "In a Time of Torture," which focused on harassment and abuse of alleged homosexuals.

During the year, there were no reports of widescale internet entrapment of homosexuals.

Section 6 Worker Rights

a. The Right of Association

There are no legal obstacles to establishing private sector unions, although such unions were uncommon. Workers may join trade unions, but were not required to do so. A union local or workers' committee may be formed if 50 employees express a desire to organize. Most union members, about one-quarter of the labor force, were employed by state-owned enterprises. Unionization decreased in the past several years as a result of early retirement plans in public sector enterprises and the privatization of many of these enterprises.

There were 23 trade unions, all required to belong to the Egyptian Trade Union Federation (ETUF), the sole legally recognized labor federation; however, requiring all trade unions to belong to a single federation infringes on freedom of association. The ETUF controlled the nomination and election procedures for trade union officers and permitted public authorities to intervene in union financial activities. The Government showed no sign that it intended to accept the establishment of more than one federation. ETUF officials had close relations with the ruling NDP, and some were members of the People's Assembly or the Shura Council. They spoke on behalf of worker concerns, and public confrontations between the ETUF and the Government were rare.

Some unions within the ETUF were affiliated with international trade union organizations. Others were in the process of becoming affiliated. The law does not permit anti-union discrimination. There were no reports of attempted discrimination, nor were there reports of attempts to enforce this protection.

b. The Right to Organize and Bargain Collectively

The 2003 Labor Law (Law 12) calls for the establishment of a labor consultative council, including representatives from the Government, employers, and workers associations. The council, in working with other labor experts, addresses tripartite issues and problems and reviews labor-related domestic and international legislation; however, the council did not meet during the year. The law provides for collective bargaining, allowing for tripartite negotiations to improve labor terms and conditions and resolve disputes between workers and employers. Collective negotiation may be set in motion by any of the concerned parties without the consent of other parties involved with the assistance of the concerned administrative authority.

The Labor Law also established special Pentagonal Committees composed of two judges and representatives from the Ministry of Manpower and Migration (MOMM), the ETUF, and employers. The Labor Law provides these committees with judicial powers to adjudicate labor disputes arising from the law's application. Decisions by these committees, which are intended to serve in place of the courts of first resort, may be appealed through the regular appeals process. During the year, the Pentagonal Committees issued more than 200 verdicts in labor disputes.

The MOMM established a unit in 2003 for collective negotiations and for monitoring the implementation of collective agreements. The Government sets wages, benefits, and job classifications for public sector and government employees, and the private sector sets compensations for its employees in accordance with the Government's laws regarding minimum wages.

The Labor Law permits strikes, but only after an extended negotiation process. There were at least 15 strikes during the year. Wildcat strikes are prohibited. Peaceful strikes are allowed, provided they are announced in advance and organized by the trade union to defend vocational, economic, and social interests. To call a strike, the trade union must notify the employer and concerned administrative authority at least 10 days in advance of the strike date, giving the reason for the strike and the date it would commence. Prior to this formal notification, the strike action must be approved by a two-thirds majority of the ETUF Board of Directors. This advance notification requirement effectively eliminates wildcat strikes. Strikes are prohibited by law during the validity of collective bargaining agreements and during the mediation and arbitration process. Strikes are also prohibited in strategic or vital entities in which the interruption of work could result in a disturbance of national security or basic services. The Labor Law also regulates litigation related to collective bargaining and allows collective bargaining in what are identified as strategic and vital establishments.

Firms, apart from large ones in the private sector, generally did not adhere to government-mandated standards. Although they are required to observe some government practices, such as the minimum wage, social security insurance, and official holidays, firms often did not adhere to government practice in non-binding matters, including award of the annual Labor Day bonus.

Labor law and practice are the same in the six existing export-processing zones (EPZs) as in the rest of the country. A Special Economic Zones (SEZ) law was issued in 2002 laying the legal foundation for the

establishment of SEZs that will be export-oriented. According to the SEZ law, rules governing labor in the SEZs will be more flexible, since the authority regulating the SEZ can tailor contracts in accordance with business needs while adhering to the general requirements of the labor law. At year's end, the Ministry of Investment was proceeding to establish an SEZ in East Port Said.

c. Prohibition of Forced or Compulsory Labor

The Constitution prohibits forced or compulsory labor. The 2003 Labor Law and the Child Law do not specifically prohibit forced and compulsory labor by children. Such practices, including by children, were reportedly rare.

d. Prohibition of Child Labor and Minimum Age for Employment

Local trade unions reported that the Ministry of Labor adequately enforced labor laws in state-owned enterprises, but enforcement in the private sector, especially in the informal sector, was lax. Employers continued to abuse, overwork, and generally endanger many working children. Changes in the Child Law have not significantly improved conditions due to lax enforcement by the Government. Enforcement remained spotty, and in cases where offenders have been prosecuted, the fines imposed were often small (e.g., 20 LE, or $3.25) and thus had questionable deterrent effect. Regulations proposed in 2003 under the revised labor law sharply increased the minimum fines in child labor cases to LE 500 ($81). The Government has developed programs that emphasize prevention and include employer, parent, and child counseling.

The law limits the type and conditions of work that children under the age of 18 may perform legally. In nonagricultural work, the minimum age for employment is 14 or the age of completing basic education (15), whichever is higher. Provincial governors, with the approval of the Minister of Education, may authorize seasonal work for children between the ages of 12 and 14, provided that duties are not hazardous and do not interfere with schooling.

Pre-employment training for children under the age of 12 is prohibited. Children are prohibited from working for more than 6 hours per day, and one or more breaks totaling at least 1 hour must be included. Several other restrictions apply to children: they may not work overtime, during their weekly day(s) off, between 7 p.m. and 7 a.m., or on official holidays. Children are also prohibited from working for more than 4 hours continuously.

Statistical information regarding the number of working children was difficult to obtain and often outdated. NGOs estimated that up to 1.5 million children worked. Government studies indicated that the concentration of working children was higher in rural than in urban areas. Approximately 78 percent of working children were in the agricultural sector. However, children also worked in light industry.

e. Acceptable Conditions of Work

During the year, the minimum wage for government and public sector employees was determined by the National Council of Wages and differed among sectors. The law stipulates that 48 hours is the maximum number of hours that may be worked in 1 week. Overtime for hours worked beyond 36 per week is payable at the rate of 25 percent extra for daylight hours and 50 percent extra for nighttime hours. The nationwide minimum wage generally was enforced effectively for larger private companies; however, smaller firms did not always pay the minimum wage. The minimum wage frequently did not provide a decent standard of living for a worker and family; however, base pay commonly was supplemented by a complex system of fringe benefits and bonuses that may double or triple a worker's take-home pay and provide a decent standard of living.

The Ministry of Labor sets worker health and safety standards, which also apply in the EPZs; however, enforcement and inspections were uneven. A council for occupational health and safety was established by the Labor Law to address health and safety issues nationwide. During the year, ETUF called for development of a national health insurance program prior to proposed changes in the health insurance law.

The new labor law prohibits employers from maintaining hazardous working conditions, and workers have the right to remove themselves from hazardous conditions without risking loss of employment.

Starting on June 11, employees at the Ora-Egypt asbestos products firm engaged in strike actions. The strikers said that 46 employees had suffered from cancer as a result of unsafe working conditions. On September 21, the Government closed Ora-Egypt.

In 2003, the Minister of Manpower said that the total number of foreign workers holding work and residence

permits was 18,177, not including Sudanese, Palestinians, and foreigners married to citizens. Unofficial estimates of undocumented workers were as high as 116,000. Foreign workers with the required permits enjoyed legal protections.

There were occasional reports of employer abuse of undocumented workers, especially domestic workers. A few employers were prosecuted during the year for abuse of domestic workers, but many claims of abuse were unsubstantiated because undocumented workers were reluctant to make their identities public.