## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ABDULAZIZ ABDULRAHMAN AL-BADAH, et al.,** | ) ) ) |
| **Petitioners,** | ) **Docket No. 1:05CV01641 (CKK)** |
| **v.** | ) ) |
| **GEORGE W. BUSH, President of the United States, et al.,** | ) ) ) |
| **Respondents.** | ) **November 3, 2005** |

**PETITIONERS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR ORDER REQUIRING 30-DAYS ADVANCE NOTICE OF TRANSFER AND/OR AN INJUNCTION PRECLUDING REMOVAL OF THE DETAINED PETITIONERS FROM GUANTANAMO ABSENT RESOLUTION OF THE PETITION BEFORE THE COURT OR THEIR UNCONDITIONAL RELEASE FROM ANY CUSTODY OR CONTROL OF THE UNITED STATES OR OTHER FOREIGN SOVEREIGN**

Pursuant to Rule 7(d) of the Local Rules of Civil Procedure, Petitioners Abdulaziz Abdulrahman Al-Badah, Abdulaziz Mohammed Al-Naser and Ibrahim Mohammed Al-Naser (the "Detained Petitioners"), together with Next of Friend Abdullah Abdulaziz Al-Badah, file this reply memorandum in support of their motion for order and/or injunction (doc no. 10) and in opposition to the respondents' memorandum in opposition to the same (doc. no. 14).

### PRELIMINARY STATEMENT

Respondents' opposition memorandum mischaracterizes the relief sought by the petitioners and buries the real issues in a meaningless recitation of irrelevant facts.[1]  To

---

[1]    The respondents' opposition memorandum addresses arguments not even raised in the Petitioners' motion.

be clear, Petitioners seek: (1) an Order requiring 30-days prior notice of the transfer of any of the Detained Petitioners and/or (2) an injunction precluding removal of the Detained Petitioners from Guantánamo absent resolution of the Petition before the Court or their unconditional release from any custody or control of the United States or other foreign sovereign.

Moreover, Petitioners' reasons for requesting relief are eminently reasonable and indeed meet the standard for issuing a notice order and/or an injunction. They are:

(1) to preserve the jurisdiction of the Court;

(2) to allow counsel to provide meaningful representation of the Detained Petitioners; and

(3) to prevent the torture of the Detained Petitioners.

The relief Petitioners seek in this motion is extremely modest: an injunction precluding removal of the Detained Petitioners from Guantánamo, and, if such injunction is not granted, notice once Respondents have made a decision to transfer Petitioners from Guantanamo. This notice is necessary to prevent the grave and irreparable harm that would befall Petitioners if Respondents were permitted to secretly transfer them into the hands of another government for continued detention. The balancing of the other equities at issue all favor entry of the order. There is no identifiable harm to Respondents from entry of the requested order. The public interest clearly supports the relief requested.

The secret transfer of Petitioners into the custody of another state for "continued detention, interrogation and/or prosecution" – which Respondents readily concede is a regular practice of the United States government – threatens to eviscerate Petitioners' fundamental rights. These rights, among others, include the habeas right recognized by

ME1\5323091.3

the Supreme Court in <u>Rasul v. Bush</u>, 542 U.S. 466, 124 S. Ct. 2686, 2698 (2004); their

rights to due process as set out in <u>In re Guantanamo Detainee Cases</u>, 355 F. Supp. 2d 443,

478 (D.D.C. 2005); and their right to be free from torture.

      The advance notice Petitioners seek will prevent Respondents from taking a

secret, unilateral action that may subvert this Court's jurisdiction, and there is simply no

doubt that this court has the power under the All Writs Act to enter the requested relief.

<u>See</u>, <u>e.g.</u>, <u>Qayed v. Bush</u>, No. 05-0454 (RMU), slip. op. at 2 (D.D.C. Apr. 6, 2005)

(holding that the court has the authority to enter an order which will serve to prevent an

abuse of the processes put in place by <u>Rasul</u> for adjudicating Petitioners' habeas claims

on their merits); <u>El-Banna v. Bush</u>, No. 04-1144 (RWR), slip op. at 4 (D.D.C. Apr. 8,

2005) ("The outcome petitioners fear, if realized, would improperly subvert the court's

ability to adjudicate these actions on their merits.").  The requested order merely

maintains the status quo for a short period of time in order to provide Petitioners and their

counsel with time to evaluate whether filing a motion to oppose the proposed transfer is

merited.

      Respondents claim that Petitioners do not have "a factual or legal basis" for the

relief sought. Resp. Br. at 1.  This claim is contradicted by numerous orders in which

judges in this District have acted to preserve the court's jurisdiction, as Respondents

themselves recognize, Resp. Br. at 1 note 1.  <u>See</u>, <u>e.g.</u>, Order dated Apr. 1, 2005, in <u>Al

Shihry v. Bush</u>, Civ. A. No. 05-490 (PLF) (ordering advance notice); <u>Kurnaz v. Bush</u>,

Civ. A. No. 04-1135 (ESH), 2005 WL 839542 (D.D.C. Apr. 12, 2005) (granting

preliminary injunction as to transfers); <u>Al-Oshan v. Bush</u>, Civ. A. No. 05-520 (RMU)

(D.D.C. Mar. 31, 2005) (ordering advance notice as part of stay); <u>Deghayes v. Bush</u>, Civ.

A. No. 04-2215 (RMC) (D.D.C. June 15, 2005)(requiring notice to the Court of any decision to transfer a particular individual to a particular country).  Petitioners are well aware that other judges in this district have denied similar motions in at least five other cases involving other Guantanamo detainees.[2]  However, Petitioners respectfully submit that these decisions stand apart from the majority view among the judges in this District. In more than twenty cases, the courts have either granted the preliminary injunction and required 30 days' notice, or ordered 30 days' notice as part of a stay of the proceedings on the merits.[3]  In four other cases, Judge Roberts asserted personal jurisdiction over the petitioner and stayed proceedings concerning release, repatriation or removal.[4]

---

[2]  See Almurtabi v. Bush, 366 F. Supp. 2d 72 (D.D.C. 2005); Al-Anazi v. Gush, 370 F. Supp. 2d 188 (D.D.C. Apr. 21, 2005) (Bates, J.); Mammar v. Bush, Order, Civ. No. 05-573 (RJL) slip. op. (D.D.C. May 3, 2005); O.K. v. Bush, Civ. No. 04-1136 (JDB) (D.D.C. Jul. 12, 2005); Attash v. Bush, Order, Civ. No. 05-1592 (RCL) (D.D.C. Sept. 1, 2005).

[3]  See Abdah v. Bush, Civ. No. 04-1254 (HHK) slip. op. (D.D.C. Mar. 29, 2005); Al-Mohammed v. Bush, Civ. No. 05-00247 (HHK), Order (D.D.C. Mar. 30, 2005); Al-Oshan v. Bush, Civ. No. 05-0520 (RMU) slip. op. at 2 (D.D.C. Mar. 31, 2005); Al-Shiry v. Bush, Order, Civ. No. 05-0490 (PLF), 2005 WL 1384680 (D.D.C. Apr. 1, 2005); Al-Wazan v. Bush, Civ. No. 05-0329 (PLF), Order (D.D.C. Apr. 1, 2005); Al-Joudi v. Bush, No. Civ. 05-3-1 (GK), 2005 WL 774847 (D.D.C. Apr. 4, 2005); Al-Marri v. Bush, Civ. No. 04-2035 (GK), 2005 WL 774843 (D.D.C. Apr. 4, 2005); Qayed v. Bush, Civ. No. 05-0454 (RMU) slip. op. at 3 (D.D.C. Apr. 6, 2005); Tumani v. Bush, Civ. No. 05-0526 (RMU) slip. op. at 3 (D.D.C. Apr. 6, 2005); El-Banna v. Bush, Order, Civ. Nos. 04-1144, 05-23, 05-586 (RWR) slip. op. at 7 (D.D.C. Apr. 8, 2005) (entering 30-day order in 3 separate cases); Al-Adahi v. Bush, Civ. No. 05-280 (GK), Order (D.D.C. Apr. 28, 2005); Anam v. Bush, Civ. No. 04-1194 (HHK) Order, (D.D.C. May 9, 2005); Al-Shamri v. Bush, Civ. No. 05-551 (RWR), Order (D.D.C. May 11, 2005) (same); Adem v. Bush, Civ. No. 05-723 (RWR), Order (D.D.C. June 6, 2005); Al Daini v. Bush, Civ. No. 05-634 (RWR) slip. op. at 4 (D.D.C. June 6, 2005); Alhami v. Bush, Civ. No. 05-359 (GK), Order (D.D.C. June 9, 2005); Mokit v. Bush, 374 F. Supp. 2d 106 (D.D.C. June 16, 2005); (Friedman, J.); Paracha v. Bush, Civ. No. 04-2022 (PLF) slip. op. at 4 (D.D.C. June 16, 2005); Ahmed v. Bush, Civ. No. 05-665 (RWR), 2005 WL 160912 (D.D.C. July 8, 2005).

[4]  See el-Mashad v. Bush, Civ. No. 05-0270 (JR) Order, (D.D.C. Apr. 7, 2005); Quassim v. Bush, Civ. No. 05-0497 (JR) Order (D.D.C. Apr. 13, 2005); Salahi v. Bush, Civ. No. 05-0569 (JR) Order, (D.D.C. Apr. 15, 2005); Aziz v. Bush, Order, Civ. No. 05-0492 (JR) (D.D.C. Apr. 20, 2005).

ME1\5323091.3

<u>**ARGUMENT AND CITATION OF AUTHORITIES**</u>

I.    **All Four Balancing Factors Weigh in Petitioners' Favor,
      <u>Especially Given the Limited Injunctive Relief The Seek</u>**

        While Respondents selectively quote judicial opinions for the proposition that preliminary injunctions are "extraordinary," Resp. Br. at 7, they fail to acknowledge the *extraordinary* facts of this entire situation.  In an *ordinary* case, a plaintiff is not held incommunicado by the respondent, is not wholly at the respondent's mercy, and is not at risk of being shipped off to a foreign torture den outside of the Court's jurisdiction. In an *ordinary* case, the plaintiff has the opportunity to present his own testimony, the plaintiff has access to his or her counsel, and the respondent does not have the power to unilaterally deprive the plaintiff of those rights.  In an *ordinary* case involving a request for habeas relief, there have typically been extensive prior legal proceedings subject to full judicial review, and no discovery may therefore be  necessary.   None of these "ordinary" facts exist here.

        Respondents also overstate the law concerning injunctive relief generally, stating:

> To prevail in a request for a preliminary injunction, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'" See <u>Katz v. Georgetown Univ</u>., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting <u>CityFed Financial Corp. v. Office of Thrift Supervision</u>, 58 F.3d 738, 746 (D.C. Cir. 1995).

Resp. Br. at 8.

        The rule in this circuit is not so strict, however.  As the Court of Appeals has stated, Petitioners are not required to prevail in each of the four factors, rather, the

factors must be viewed as a continuum with more of one factor compensating for less of another. If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak. See Washington Metro. Area Transit Comm 'n v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C. Cir. 1977) ("An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant. There is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success.").

     **A.**    **It Cannot be Reasonably Disputed that Petitioners Will Suffer Irreparable Harm if They are Rendered to a Foreign Nation Without Notice or An Opportunity to Be Heard**

Contrary to Respondents' contentions, Petitioners' motion is in accord with their Petition for Writs of Habeas Corpus. See Resp. Br. at 9-12. Indeed, Petitioners are not seeking their unconditional release. Rather, Petitioners merely seek to prevent their transfer to a country where the practice of torture is systematic and widespread. In fact, there is ample evidence both (1) that Petitioners are subject to a very real risk of being rendered into the custody of a foreign government, and (2) that Saudi Arabia, the most likely country to which they would be sent, routinely engages in torture.

The declaration Respondents offer from Mr. Waxman itself acknowledges that it is the United States' policy to "transfer [] GTMO detainees... to the control of other governments for investigation and possible prosecution and continued detention" where the government functionaries deem it appropriate. See Resp. Br. Exh. A (Waxman Decl. at ¶ 3). Furthermore, recent news reports confirm that the United States Government has

ME1\5323091.3

a "plan to cut by more than half the population at its detention facility in Guantanamo Bay, Cuba, in part by transferring hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan and Yemen, according to senior administration officials."  See Douglas Jehl, *Pentagon Seeks to Transfer More Detainees from Base in Cuba*, The New York Times, Mar. 11, 2005 (Exhibit A).

Petitioners dispute Respondents' assertions that Petitioners' motion contains "rife speculation" that is contrary to "the sworn declarations of high-level Executive Branch officials."  See Resp. Br. at 10.  Indeed, the artfully crafted declarations put forth by Respondents do nothing to assuage Petitioners' reasonable apprehensions.  For instance, in his declaration Mr. Waxman states:

> transfer of detainees are extremely sensitive matters that involve diplomatic relations with other countries, as well as law enforcement and intelligence interests of other countries.  Requiring the United States to unilaterally disclose information about the proposed transfers and negotiations outside of appropriate executive branch agencies … could impede out country's ability to obtain vital cooperation from concerned governments with respect to military, law enforcement and intelligence efforts with respect to our joint efforts in the war on terrorism.

Resp. Br. Exh. A (Waxman Decl. ¶ 8 (emphasis added.))  It is not too difficult to read between the lines in the  Waxman's Declaration.  This is especially the case given recent reports regarding CIA terror prisons elsewhere in the world.  See Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, The Washington Post, Nov. 2, 2005 (Exhibit B). Indeed, the Waxman declaration supports the argument that because of the possibility that Petitioners might be transferred to a country where torture is widespread, Petitioners' counsel should have knowledge of any proposed transfer out of Guantánamo.

Mr. Waxman also admits that transferee foreign governments include "the government of a detainee's home country, or a country other than the detainee's home

ME1\5323091.3

country that may have law enforcement or prosecution interest in the detainee." Resp. Br. Exh. A (Waxman Decl. at ¶ 3). In this case, the home country for all of the Detained Petitioners is Saudi Arabia, a country well-known for its frequent use of torture.[5]

There are two distinct and equally important harms that would be suffered by Petitioners if they were rendered to Saudi Arabia with no opportunity to challenge such a transfer. First, Respondents, after transferring Detained Petitioners to Saudi Arabia, would surely turn around and argue that this Court no longer has jurisdiction over the case. The Supreme Court has made it plain, however, that this Court presently has jurisdiction over Petitioners' claims, and that such claims are actionable under United States law. See Rasul v. Bush, 124 S. Ct. 2686, 2698 n.15 (2004). The requested injunction does nothing more than preserve this Court's well established jurisdiction over this dispute, and prevent Respondents from exercising self-help to avoid that jurisdiction by disposing of an inconvenient litigant.

Second, while Respondents apparently deny that the government of Saudi Arabia (the home country of Petitioners) routinely engages in torture, this inexplicable position is simply contrary to the views held by experts in the field. See Declaration of Brian Evans (stating that in Saudi Arabia, "the use of torture or other forms of ill-treatment to extract confessions is commonplace")(Exhibit C). Respondents criticize our motion's citation to recent news reports as inadequate, but these reports are in accord with extensive, historical data from others - including the U.S. government itself.

---

[5]    Petitioners do not concede that it would be proper for them to be rendered to some country other than Saudi Arabia. In this reply, Petitioners focus on Saudi Arabia primarily because Saudi Arabia is the country of their origin. The requested 30-day notice in advance of any transfer should allow Petitioners adequate time to evaluate and address, if necessary, torture concerns at any specified location where they might be rendered.

On February 28, 2005, the U.S. State Department issued its 2004 Country Report on Human Rights Practices for Saudi Arabia, which contained, among other things, the following overall summary:

> The Government's human rights record remained poor overall with continuing serious problems… Security forces continued to abuse detainees and prisoners, arbitrarily arrest, and hold persons in incommunicado detention. There were cases in which Mutawwa'in [the religious police, a semiautonomous agency of the Kingdom of Saudi Arabia] continued to intimidate, abuse, and detain citizens and foreigners. Most trials were closed, and defendants usually appeared before judges without legal counsel. Security forces arrested and detained reformers, some of whom continued at year's end to seek an open trial.

(Exhibit D.)

The U.S. State Department's report also set forth a number of disturbing details. Widespread reports of abuse and mistreatment of prisoners in the Kingdom of Saudi Arabia was explicitly acknowledged. E.g., id., at 2 ("…authorities reportedly at times abused detainees, both citizens and foreigners. Ministry of Interior officials were responsible for most incidents of abuse of prisoners, including beatings, whippings, and sleep deprivation. In addition, there were allegations of beatings with sticks and suspension from bars and handcuffs. There were allegations that these practices were used to force confessions from prisoners."). In addition, the State Department cited the reports of citizens of close allies of the United States who reported being tortured while in detention in the Kingdom of Saudi Arabia. Id., at 2 ("Canadian and British prisoners released in 2003 reported that they had been tortured during their detention."). In evaluating Respondents' comments on the importance of any assurances that the United States government intends to obtain from the Kingdom of Saudi Arabia that Petitioners would not be tortured upon their transfer to the Kingdom of Saudi Arabia, it is worth

noting that the State Department itself reports that the Kingdom of Saudi Arabia does not permit outside investigation of the widespread reports that torture is a systematic feature of imprisonment in Saudi Arabia. Id., at 2 ("Maintaining its reservation to Article 20 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the Government does not recognize the jurisdiction of the Committee Against Torture to investigate allegations of systematic torture.").

These comments noted above come from the United States Government itself.[6]  Moreover, non-governmental organizations have long reported on torture and abuses by the Kingdom of Saudi Arabia.  See, e.g., Declaration of Brian Evans (Exhibit C).

Reports of abuse and torture of detainees in Saudi Arabia are widespread, and the United States Government is disingenuous in its attempts to suggest otherwise. It is similarly absurd for the Respondents to seek to avoid an injunction by claiming that the Petitioners have not proven that a transfer is "imminent." The Respondents' own affidavits assert that "[t]he United States has no interest in detaining enemy combatants longer than necessary," and Mr. Prosper even complains,  in his Declaration, that judicial review of a decision to transfer the Petitioners may "undermine the United States' ability to reduce the number of individuals under U.S. control." Resp. Br. Exh. B (Prosper Decl. at ¶ 2 & 12). At least 73 detainees have already been transferred from Guantanamo into the custody of another government, and this number does not even include the numerous

---

[6]     Given these extensive, pointed, and highly negative comments about Saudi Arabia made in a formal United States report, the claims made by Respondents and their Declarants that U.S. diplomacy will be seriously and irreparably undermined by a mere procedure in which a few Petitioners' counsel would receive advance notice of transfers, and might (or might not) suggest in the future that torture of

other detainees transferred to foreign governments from facilities other than Guantanamo, or those transfers that the Respondents do not wish to publicly acknowledge. Id. at 2; see also Exhibit B.

The need for this Court to grant the requested relief is especially pressing due to the increasing number of accounts in which Respondents have engaged in extraordinary rendition. According to several news reports, including several cited in Petitioners' Petition for Habeas Corpus, the United States has secretly removed detainees and others suspected of terrorist crimes to other countries for interrogation or detention without complying with extradition or other legal process. This practice, known as "rendition," "irregular rendition," or "extraordinary rendition," is understood to be used to facilitate interrogation by subjecting detainees to torture. Respondents have also engaged in rendition to avoid judicial orders and judgments. For example, when another judge of this Court recently found that the allegations of Omar Abu Ali - an American citizen claiming that he was being detained and tortured in Saudi Arabia at the direction of the United States - were sufficiently credible to warrant jurisdictional discovery, see Ali v. Ashcroft, No. 04-1258 (IDB), 2004 U.S. Dist. LEXIS 25239, at *122, (D.D.C., filed Dec. 16, 2004), the United States acted to moot Ali' s habeas case by returning him to the United States to face criminal proceedings. See Daniel Eisenberg, *The Rough Justice of War*, Time Magazine, Mar. 7, 2005 (Exhibit E).

Respondents' documented practice of transferring suspects outside the United States substantiates Petitioners' fears of being deprived of United States judicial protection. Moreover, whether Petitioners are subject to a transfer tomorrow, or next

---

prisoners occurs in Saudi Arabia, or that greater assurances against the torture of their clients ought to

ME1\5323091.3

week, or the week after that, such facts are exclusively within the control of the Respondents. In sum, there is substantial evidence of Respondents engaging in the practice of rendition; the most compelling is from Respondents' own statement that they will not disclose whether or when such transfers will take place. Clearly, the Petitioners have presented a sufficiently severe and substantial risk of harm to justify the limited injunctive relief requested here.

**B.     The Requested Injunction Would Cause No Cognizable Harm to Respondents**

Respondents fail in their attempt to demonstrate some theoretical "harm" to themselves, when they conjure a parade of horribles that would supposedly result if they were enjoined from transferring Petitioners into the custody of a foreign government without notice or any opportunity for Petitioners to be heard. The requested injunction does not prevent or prohibit the Respondents from obtaining "assurances" from a foreign government, although such "assurances" appear to be of limited value in any event. Certainly, this Court may lift or modify an injunction if Respondents can demonstrate a justification for doing so, and the only effect that an injunction would have in this case would be to permit the Petitioners to challenge a transfer, and prevent the possible loss of this Court's jurisdiction, before that transfer takes place.

Nor is there any legitimate fear of "disclosure" of confidential communications with a foreign government.  Respondents' alleged "chilling effect" would come from "public" disclosures, Resp. Br. at 8, but there can be no dispute that, in this case, secure facilities have already been established, specifically for the handling,

---

be considered, borders on the outrageous. Moreover, all such proceedings could be sealed in any event.

ME1\5323091.3

review and maintenance of sensitive classified information, and that counsel for Guantanamo detainees have access to extensive information that will not be shared either with the public or with their clients. Respondents have failed to identify any manner in which "sensitive" negotiations would be affected if they were "disclosed" only to the Court and counsel in this case, in the context of sealed communications reviewable only in the secure facilities that have already been established.

### C.    Public Policy Clear Favors the Requested Information

Respondents assert that they, and only they, can determine whether or when a Guantanamo detainee should be transferred to a foreign country, and that they will do so unless they, in their alleged sole and unreviewable discretion, find it "more likely than not" that the transferee "will" be tortured. Resp. Br. Exh. A (Waxman Decl., at ¶ 6); Exh. B (Prosper Decl., at ¶ 4). In other words, Respondents claim that this Court can do nothing to prevent the loss of its jurisdiction or the violation of applicable law, so long as the Secretary of the Navy, apparently, can convince himself that there is only a 50% chance that a detainee "will" (not may) be tortured.

Such claims of unfettered discretion have been repeatedly rejected by the federal courts in recent cases, including the Supreme Court's decision in Rasul, *supra*. As the United States District Court for the District of South Carolina astutely observed, in rejecting yet another recent argument for unfettered executive discretion, "[c]ertainly, Respondent does not intend to argue here that, just because the President states that Petitioner's detention is 'consistent with the laws of the United States... ' that makes it so. Not only is such a statement in direct contravention to the well settled separation of powers doctrine, it is simply not the law." Padilla v. Hanft, Civil Action No. 2:04-2221

13

26-AJ, Opinion and Order at 18 (D.S.C., filed February 28, 2005). Regardless of how satisfied the Executive Branch may feel about its own decisions, when a federal litigant is properly before a Court that has exercised jurisdiction over the underlying claims in a case, that litigant must be provided a meaningful opportunity to contest a transfer seeking to place him outside the Court's jurisdiction or into the hands of torturers.

**D.    Petitioners' Underlying Claims Are Substantial and Should Not be Terminated by the Respondents' Unilateral Actions**

While Respondents continue to steadfastly refuse to recognize the fact, there can be no real dispute that the Petitioners have presented substantial claims that should be heard by this Court without unilateral interference by the Respondents. The Supreme Court itself has noted the viability of Petitioners' habeas corpus claim:

> Petitioners' allegations - that, although they have engaged neither in combat nor in acts of terrorism, " they have been held in Executive detention for more than two years in territory subject to the long-term, exclusive jurisdiction and control of the United States, without access to counsel and without being charged with any wrongdoing unquestionably describe "custody in violation of the Constitution or laws or treaties of the United States,"

Rasul v. Bush, 124 S. Ct. 2686, 2698 n.15 (2004) (citing 28 U.S.C. § 2241(c)(3)).

Judge Green of this Court, in her January 31, 2005 Order in the consolidated Guantanamo Cases, followed the Supreme Court's direction and rejected many of the same arguments made by Respondents here. Civil Action No. 02-0299 and consolidated cases (D.D.C., filed Jan. 31, 2005). In particular, Judge Green found that the Guantanamo detainees in eleven consolidated cases stated viable claims under the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment, and the Third Geneva Convention.

14

Respondents argue that the Petitioners must establish that they are likely to succeed in obtaining an order to terminate their detention in order for Petitioners' motion to be granted.   Resp. Br. at 13. This argument, however, misses the point.  As noted above, the Supreme Court in <u>Rasul</u> confirmed this Court's jurisdiction, and Judge Green in the consolidated Guantanamo Cases ruled that valid claims exist.  The issue, then, is not simply whether Petitioners might, in the abstract, have standing to file a separate lawsuit alleging independent grounds to block the Government's planned transfers if they were otherwise not in Court.[7]  Instead, the salient  question is whether this Court, having already accepted jurisdiction over a live controversy, may act to preserve its jurisdiction already properly exercised. The answer to that question is clearly yes.

It is also important to note here that it is not even clear that this motion will ever prevent any transfers the Government wishes to effect. Indeed, Petitioners may never even try to prevent any future transfers.   If the motion is granted and the Government provides proper notice, Petitioners may well decide not to challenge the Government's proposed transfers.[8]   Alternatively, if the motion is granted, the Government may decide not to render these Petitioners into another country's detention.

---

[7]   Although necessary to the resolution of this motion, which does not ask this Court to rule on any substantive claims, Petitioners do submit that they possess such independent rights pursuant to the Geneva Conventions, as well as under articles 1 and 3 of the U.N. Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, article 7 of the International Covenant on Civil and Political Rights, and article 5 of the American Convention on Human Rights, among other sources. As noted, however, no ruling on these issues is necessary - preliminary injunctive relief rarely resolves substantive rights; it merely preserves the status quo while the disputes are addressed in litigation.

MEI\5323091.3

Thus, the Respondents' dire warnings of judicial interference in foreign policy decisions of the Executive Branch, and separation of powers concerns, surely must ring hollow - they are premature, if not irrelevant at this stage.   In sum, the limited relief Petitioners' motion seeks is quite modest.  Under such circumstances, it is obvious that this Court has the authority to preserve its jurisdiction by ordering Respondents to simply give notice of a decision already made, during this interim period, before the transfer is carried out. The requested relief is similar to the requirement ordered by Judge Green in <u>Habib, et al. v. Bush, et al.</u>, No. 02-1130 (CKK) (Order of November 29,2004) (denying TRO without prejudice, but noting that "[s]hould there be any chance that the circumstances upon which the Application was based will in fact arise, counsel for respondents shall provide counsel for petitioner at least five business days of advanced notice, which should be sufficient time to allow counsel for petitioner to renew the Application.").

Given the very limited relief sought by Petitioners here, and the severe harm Petitioners would suffer if they lost meaningful access to this Court and were rendered to Saudi Arabia, the balance of factors to be considered by this Court weighs heavily in Petitioners' favor, and the motion should be granted.

---

[8]     Indeed, if Mr. Waxman's statement about how most of the rendered detainees have since been released by foreign governments is correct, <u>see</u> Resp. Br. Exh. A (Waxman Decl. at' 5), one can expect that most of the 30-day notices will not lead to transfer challenges - unless there is a true risk of torture.

ME1\5323091.3

**E.    Denial of the Motion Would Be Improper Before Discovery in Any Event**

There can be no doubt - and Respondents do not deny - that this Court may order discovery in a habeas corpus case. Respondents also must acknowledge that (a) Petitioners have been held incommunicado and have not been allowed to speak even with their lawyers, and (b) the facts surrounding Petitioners' potential transfer lie exclusively within the Respondents' possession. The Respondents are seeking here to use their exclusive control of the facts as a weapon, by presenting this Court with generalities of supposed procedures while refusing disclosures of any details applicable to the Petitioners themselves. The Respondents' declarations, for example, provide no detail as to how well, when, or even if these generalized procedures are followed, and provide nothing by which the Court may gauge the accuracy of Respondents' assertions.

The generalized procedures outlined by Respondents, however, are not the last word on the subject. It is becoming increasingly plain that United States security agencies have often been given carte blanche with respect to rendition, and that there are numerous undisclosed persons operated around the world at which the United States government is detaining and interrogating individuals. See Exhibit B.

Petitioners submit that they have established a strong and adequate basis for their motion to be granted. Nevertheless, given that the Respondents have sole possession of all the facts needed to successfully challenge a decision to render the Petitioners to the custody of a foreign government, and yet have submitted only generalized, limited declarations, Petitioners also submit that this Court, if it is inclined to deny this motion, should first allow Petitioners to engage in limited discovery in an effort

17

MEI\5323091.3

to support their request for relief. That discovery should, at a minimum, permit Petitioners to serve discovery and inquire of the Declarants as to the factual basis of their assertions.

### CONCLUSION

For the reasons presented above and in those set forth in the Petitioners' Statement of Points and Authorities, Petitioners' motion should be granted.

Respectfully Submitted,


By:_____
    Arnold L. Natali, Jr.  (NJ4811)
    LEAD COUNSEL
    McCarter & English, LLP
    Four Gateway Center
    100 Mulberry Street
    Newark, New Jersey 07102
    (973) 622-4444
    (973) 624-7070 Fax

    Jason C. Welch  (CT23418)
    McCarter & English, LLP
    CityPlace I
    36th Floor
    Hartford, CT  06103
    (860) 275-6700
    (860) 724-3397 Fax

    *Of Counsel*
    Barbara Olshansky (NY0057)
    Center for Constitutional Rights
    666 Broadway, 7th Floor
    New York, NY  10012
    (212) 614-6439
    (212) 614-6499 Fax

    Counsel for Petitioners

ME1\5323091.3