Source: Legal > Area of Law - By Topic > Corporate > General News & Information > Time Magazine
Terms: **headline(rough justice of war)**  (Edit Search | Suggest Terms for My Search)

*The Rough Justice of War; Is prosecution getting too aggressive? Two thorny new cases, both against U.S. citizens, spotlight the difficulty of melding American legal principles with the global pursuit of terrorists. TIME investigates the charges against AHMED OMAR ABU ALI, who is accused of plotting to kill President Bush, and ILARIO PANTANO, a Marine officer who allegedly killed two Iraqis in cold blood Time Magazine*
*March 7, 2005*

Copyright 2005 Time Inc.
Time Magazine

March 7, 2005

**SECTION:** U.S. EDITION; NATION; Pg. 32

**LENGTH:** 1622 words

**HEADLINE:** The **Rough Justice of War**;
Is prosecution getting too aggressive? Two thorny new cases, both against U.S. citizens, spotlight the difficulty of melding American legal principles with the global pursuit of terrorists. TIME investigates the charges against AHMED OMAR ABU ALI, who is accused of plotting to kill President Bush, and ILARIO PANTANO, a Marine officer who allegedly killed two Iraqis in cold blood

**BYLINE:** Daniel Eisenberg, Reported by Elaine Shannon; Perry Bacon Jr./Washington; Scott MacLeod/Tangier

**BODY:**
THE CASE OF ALLEGED TERRORIST ABU ALI

Ahmed Omar Abu Ali says he survived torture in a Saudi prison. Now the 23-year-old American, indicted on questionable charges of involvement in an alleged al-Qaeda plot to assassinate President George W. Bush, faces another tough challenge: the puzzling vagaries of post-9/11 U.S. justice. The son of Jordanian immigrants from Falls Church, Va., Abu Ali was arrested in a security sweep on June 9, 2003, while taking an exam at the Islamic University of Medina. He then languished for months in a Saudi jail. He was interrogated and, his family claims, tortured. All the while, U.S. and Saudi investigators played a game of hot potato, each country hoping the other would charge Abu Ali with a crime.

The Saudis ultimately found that they could not build a case against him, but they did not want Abu Ali running around their country. U.S. officials, who say Abu Ali "was not on the radar screen" before the Saudis arrested him, developed a deep interest in him once they did but also had trouble lining up sufficient evidence. Finally, Abu Ali's family filed a civil suit last summer to get him returned to the U.S., forcing the Justice Department's hand. The Saudis, eager to avoid the p.r. nightmare of putting an American citizen on trial for terrorism, were relieved to hustle Abu Ali aboard an FBI flight to Washington. Now it was the U.S. that faced a deadline to indict him or let him go.

At least Abu Ali can now have his day in court--an American court. The charges the U.S. filed against him, detailed in a six-count federal indictment unsealed last week, certainly sounded explosive, centering on the young man's alleged talk that he was ready to kill the President, by either shooting him in the street or setting off a car bomb. But like a number of other high-profile U.S. terrorism prosecutions since 9/11 that have grabbed big headlines only to quietly fizzle or stall in trial--from alleged terrorist flight student Zacarias Moussaoui and accused dirty bomber Jose Padilla to the Detroit sleeper cell and former enemy combatant Yaser Hamdi--the case against Abu Ali may not play out so dramatically. "He fell in with some bad people but probably never did much himself but talk," says a source in the Middle East who has knowledge of the case. "Prosecutors have an uphill battle."

Perhaps their toughest yet. Though U.S. and Saudi investigators say they have strong suspicions that Abu Ali was a committed al-Qaeda believer keen to plan terrorist attacks, neither country could tie him to a specific operation in the works. The circumstances of his Saudi detention will also be an issue. Once the Saudis decided they didn't have much of a case, they believed they were doing the U.S. a favor by letting

the FBI park Abu Ali there, says a source close to the case. The Americans insist the Saudis were not merely keeping Abu Ali on ice but, in the words of a State Department official, "wanted this guy. They thought they could charge him." Either way, the situation came to a head when federal District Judge John Bates ruled that the U.S. might have to disclose its role in the detention.

The Abu Ali case appears to be based largely on evidence gathered by the foreign-intelligence service of a Saudi regime that has scant regard for human rights. The best witnesses against Abu Ali, who vehemently denies all the charges, are other prisoners in Saudi jails or members of the Saudi domestic-security service who conducted the interrogations. But, acknowledges a senior U.S. counterterrorism official, "it's unlikely we'll ever get them here to testify." One key witness is dead: the al-Qaeda operative with whom Abu Ali allegedly discussed assassinating Bush was killed in a shootout with the Saudis in September 2003. And the trial will be complicated by rising public criticism of Washington's policy of having terrorism suspects interrogated in third-party countries like Egypt and Jordan, where governments use methods of persuasion not allowed in the U.S.

Abu Ali and his family have gone public with accusations that he was tortured while in Saudi custody. During his first appearance in a Virginia court, he offered to strip down and show his scars. The U.S. and Saudi Arabia reject the accusations. In a brief filed by the U.S., prosecutors say neither consular officials and FBI agents who visited Abu Ali in detention nor an American doctor who examined him after the Saudis handed him over saw any signs of mistreatment. On the 20-hr. journey to Washington on the FBI's G-5 jet, a U.S. official says, agents reported he looked "as healthy as a horse," chatting easily and never once complaining of any prior mistreatment. But in the civil case initiated by Abu Ali's family, Judge Bates said, "There has been at least some circumstantial evidence that Abu Ali has been tortured during interrogations, with the knowledge of the United States."

Even the indictment against Abu Ali is not as devastating as the government has implied. Instead of charging him with terrorism conspiracy, the U.S. had only enough to go with the lesser charge of material support to terrorism. The evidence: Abu Ali allegedly associated with figures suspected of ties to al-Qaeda, who gave him money to buy a laptop and cell phone, and he allegedly professed a desire to become a "planner of terrorist operations like Mohammed Atta." Though Abu Ali does not appear to be particularly resourceful or hardened, a Justice Department official notes, "the problem is, What if he hooks up with somebody [who is]?" If convicted on only those modest counts, he still could face up to 80 years in prison.

Justice officials shrug off any weaknesses in the case. "We wouldn't have brought it unless there was some confidence we'd be able to prove it in a court of law," says one. The same officials claim that criticism of the particulars in this case and others like it misses the point. Since 9/11, they say, their marching orders have been very clear: disrupt first, prosecute later. That may mean potentially sacrificing a legal victory by gathering evidence in unorthodox or inadmissible ways, or resorting to the Al Capone strategy of using lesser charges--like immigration violations, minor perjury or food-stamp fraud--to keep a suspect off the street. That can make for rough justice. Says an official: "The American people want it all ways. They want the disruption, and they want it to look pretty."

It's a safe bet that the Abu Ali case never will. The U.S. first got wind of him in the spring of 2003, when close to 70 FBI agents from the Washington field office went to Saudi Arabia to help investigate bombings in Riyadh that killed 34 people, including nine Americans. This time the Saudis were more willing than in previous joint operations to share with their American counterparts evidence from the interrogations of hundreds of suspects rounded up after the attacks. As it turned out, the indictment alleges, two of the most sought-after suspects in that case met with Abu Ali sometime after September 2002. Described in the U.S. indictment as his co-conspirators, they allegedly taught him how to use weapons and discussed setting up an al-Qaeda cell in the U.S. A week after Abu Ali's arrest, the FBI searched his parents' home in Virginia and found, among other things, Arabic audiotapes "promoting violent jihad"; a book by Osama bin Laden's deputy, Ayman al-Zawahiri, condemning democracy as a "new religion that must be destroyed"; and an issue of Handguns magazine. "That was pretty damning stuff," says Victoria Toensing, a former terrorism prosecutor now in private practice. But, she adds, "a professor of terrorism could have that stuff too."

And so could any student, like Abu Ali, who attended the controversial Islamic Saudi Academy (I.S.A.) in northern Virginia while growing up. The eldest of five children, Abu Ali was born in Houston in 1981, but by the time he was 3, his family had settled in suburban Virginia, a short commute from his father's job as a computer systems analyst at the Saudi embassy in Washington. In many ways, young Abu Ali had a fairly

typical American upbringing, playing soccer, tutoring other kids, passionately cheering on the Washington Redskins and even dreaming of one day becoming President of the U.S.

What may have changed his dreams were the years Abu Ali spent at I.S.A., a school set up by the Saudi government in 1984 for children of its diplomats and eventually open to Muslims of all nationalities. The school insists it does not teach intolerance, but many of the religious textbooks once used there had the markings of the Saudi brand of fundamentalist Islam. It was enough to launch Abu Ali on a career in Islamic studies that eventually led him to Saudi Arabia, where he enrolled at a school known for having turned out several militants. Still, his former teachers and classmates swear that he was far from an angry budding young terrorist at I.S.A. They remember him as someone who regularly attended an interfaith group and spoke with "the voice of reason" whenever schoolmates launched into anti-Israel tirades. Yahya Fouz, a former classmate, says, "I remember him telling me that, yes, there is only one God, but the beauty is the fact that people are able to take numerous paths to find him." Ahmed Omar Abu Ali, unfortunately, found trouble, and lots of it, on the path he chose. --Reported by Elaine Shannon and Perry Bacon Jr./Washington and Scott MacLeod/Tangier

Young Abu Ali had a typical American upbringing, playing soccer and cheering on the Redskins

**GRAPHIC:** B/W PHOTO ILLUSTRATION: MUSLIM AMERICAN SOCIETY--AP, COLOR PHOTO: MICHAEL KLEINFELD--UPI/LANDOV, FAMILY AFFAIR, In July, Abu Ali's father Omar and sister Tazmeem, left, filed a habeas petition in a Washington federal court; COLOR PHOTO, HAPPY DAYS, In a picture taken in Falls Church, Va., several years ago, a teenage Abu Ali, above left, poses with a friend

**LOAD-DATE:** February 27, 2005

Source:  Legal > Area of Law - By Topic > Corporate > General News & Information > Time Magazine
Terms:  **headline(rough justice of war)**  (Edit Search | Suggest Terms for My Search)
View:  Full
Date/Time:  Thursday, November 3, 2005 - 4:20 PM EST

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.